[No. G044216. Fourth Dist., Div. Three. Nov. 29, 2011.]

GIL KIM, Plaintiff and Respondent, v.
WESTMOORE PARTNERS, INC., et al., Defendants and Appellants.

270

## Counsel

Murphy, Pearson, Bradley & Feeney, Aaron K. McClellan, James F. Monagle and Tanis J. Leuthold for Defendants and Appellants.

Law Offices of Timothy J. Donahue, Timothy J. Donahue; and John Park Yasuda for Plaintiff and Respondent.

## Opinion

**BEDSWORTH, Acting P. J.**—We reluctantly return in this case to the question of default judgments with a cautionary tale—well, three actually. The first is a tale for plaintiff's attorneys, who may assume a defendant's default is an unalloyed gift: an opportunity to obtain a big judgment with no significant effort. It is not. Instead, when a defendant fails to timely respond to the complaint, the first thing plaintiff's counsel should do (after offering an extension of time to respond)[1] is review the complaint with care, to ascertain whether it supports the specific judgment the client seeks. If not, a motion to

---

[1] When we say counsel "should" offer an extension of time to respond, we do not mean to imply any legal obligation to do so—merely a standard of professionalism. "While as a matter of professional courtesy counsel should have given notice of the impending default, and we

amend is in order. In this case, counsel for plaintiff Gil Kim failed to do that. Instead, he simply asked the court to enter defendants' defaults on the complaint as initially alleged. Unfortunately for Kim, the factual allegations of that complaint do not support any judgment in his favor.

And even when the allegations of a complaint do support the judgment a plaintiff seeks, he is not automatically entitled to entry of that judgment by the court, simply because the defendant defaulted. Instead, it is incumbent upon the plaintiff to *prove up* his damages, with actual evidence. It is wholly insufficient to simply declare, as Kim did here, that defendants' breach of one or more promissory notes "caused [him] tremendous financial loss," and that a judgment of "$5 million against each defendant, for a total of $30 million . . . would be a reasonable sum." That evidence may establish the amount Kim *feels* entitled to recover, but it fails utterly to demonstrate what he is *legally* entitled to recover. Kim's failure to offer any significant evidence to support his damage claims precludes any monetary judgment in his favor.

We consequently reverse the default judgment entered in Kim's favor, and remand the case to the trial court with directions to enter judgment in defendants' favor.

The second cautionary tale is for trial courts. And it is not the first time we have told this tale. As we previously explained in *Heidary v. Yadollahi* (2002) 99 Cal.App.4th 857, 868 [121 Cal.Rptr.2d 695], "[i]t is imperative in a default case that the trial court take the time to analyze the complaint at issue and ensure that the judgment sought is not in excess of or inconsistent with it. It is not in plaintiffs' interest to be conservative in their demands, and without any opposing party to point out the excesses, it is the duty of the court to act as gatekeeper, ensuring that only the appropriate claims get through. That role requires the court to analyze the complaint for itself—with guidance from counsel if necessary—ascertaining what relief is sought as against each defaulting party, and to what extent the relief sought in one cause of action is inconsistent with or duplicative of the relief sought in another. The court must then compare the properly pled damages for each defaulting party with the evidence offered in the prove-up." Unfortunately, the trial court in this case seems not to have done that, and instead simply gave Kim what he asked for—which in this case was $30 million. Even more unfortunately, this trial court is certainly not alone in doing so, even since *Heidary* was published. (See, e.g., *Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161 [36 Cal.Rptr.3d 663] [$8 million in compensatory damages awarded on a complaint alleging $50,000 in damages].) We need to shore this up. The

decry this lack of professional courtesy [citation], counsel was under no legal obligation to do so. [Citations.]" (*Bellm v. Bellia* (1984) 150 Cal.App.3d 1036, 1038 [198 Cal.Rptr. 389].)

court's role in the process of entering a default judgment is a serious, substantive, and often complicated one, and it must be treated as such.

And third, this case is a cautionary tale for appellate counsel. Those who practice before this court are expected to comport themselves honestly, ethically, professionally and with courtesy toward opposing counsel. The fact a respondent has no obligation to file a brief at all, in no way excuses his counsel's misconduct if he chooses to do so. The conduct of Timothy J. Donahue, Kim's counsel herein, which included seeking an extension of time to file his brief under false pretenses, and then filing a brief which was not just boilerplate, but a virtual copy of a brief for another case—including a *boilerplate accusation of misconduct* against appellants' counsel and a *boilerplate request for sanctions* based on a purportedly "frivolous" appeal—will not be countenanced. Donahue's response to this court's notice, informing him that we were contemplating the imposition of sanctions on our own motion, was both truculent and dismissive, going so far as to assert that we must have issued the notice in error. We did not. Nor did we appreciate him responding to our order that he appear to address possible sanctions against him by sending in his stead an attorney who had not been informed sanctions were being considered, and knew nothing about our order. Donahue's conduct on appeal was inappropriate in nearly every respect, and we hereby sanction him in the amount of $10,000.

## FACTS

Gil Kim's unverified complaint, filed March 25, 2009, alleges defendants Matt Jennings and Rob Jennings are "sophisticated businessmen, licensed investment brokers and/or experienced in selling investments to the general public." It further alleges that "[o]ver the last several years," the Messrs. Jennings "opened up and formed several companies and businesses," including Westmoore Partners, Inc., Honolulu Harry's, Inc., Westmoore Capital, Inc., and Temecula Harry's Pacific Grill, LLC, each of which is also named as a defendant.

According to the complaint, the two Jenningses "would mix, mingle and shuffle money between the different companies, close one and open another one. This was designed to hide assets and evade potential creditors."

All six defendants were allegedly "jointly involved in, owned and operated a global multi-level marketing business, and . . . sought investment money from plaintiff." Although Kim initially thought defendants were "honest, reputable and forthright," he learned only "within the last year," after defendants had "taken" his money, that this was untrue.

Allegedly, defendants initially borrowed only "a little bit of money" from Kim, and promised a substantial return. And in fact, Kim acknowledges that "[i]n the beginning, defendants paid a substantial return," although he asserts they did so "as bait, to entice [him] to loan more money." This alleged enticement was apparently effective, as Kim asserts he did loan defendants more money, again relying upon their promise "to repay the loans with a substantial return."

Defendants then allegedly enticed Kim to once again lend them even more money, "by informing [him] that they really didn't need his money." Then, in August of 2006, Matt and Rob Jennings, acting on behalf of the other defendants, allegedly promised to make monthly payments, in the amount of $13,020.85, on an office building owned by Kim, in exchange for Kim's investment of $1.25 million. However, according to Kim, defendants "had no intention of repaying the loan."

Kim attaches to his complaint, and incorporates by reference, seven promissory notes which reflect defendants' alleged indebtedness to him. He asserts that within the last year, defendants have each "acknowledged responsibility to pay on the seven notes, and have promised to pay [him]." However, "defendants have never followed through on [the] promises and the money remains outstanding."

The first promissory note reflects that on February 28, 2003, Westmoore Partners, Inc., promised to pay Kim $25,000, on the maturity date of March 28, 2003—only 30 days later. Interest payments of $750 per month were due on the 28th of each month, starting on February 28, 2003. It provides that a default occurs if Westmoore Partners fails to pay the principal and interest on the maturity date.

The second promissory note reflects that on May 29, 2003, Westmoore Partners, Inc., promised to pay Kim $25,000, on the maturity date of December 29, 2003—only seven months later. Interest payments of $750 were due on the 29th of each month, "starting February 28, 2003."[2] It provides that a default occurs if Westmoore Partners fails to pay the principal and interest on the maturity date.

The third promissory note reflects that on June 10, 2003, Honolulu Harry's, Inc., promised to pay Kim $50,000, on the maturity date of August 10, 2003—two months later. Interest payments of $1,500 per month were due on the 10th of each month, starting on July 10, 2003. It provides that a default occurs if Honolulu Harry's, Inc., fails to pay the principal and interest on the maturity date.

---

[2] That date is not a typo—at least not ours. This promissory note, dated May of 2003, provides for interest payments to have commenced three months prior to the date of the note.

The fourth promissory note reflects that on August 6, 2003, Matt Jennings promised to pay Kim $78,750, on or before October 6, 2003—two months later. The note further specifies that the funds are "immediately due and payable" upon sale of a specified piece of real property owned by Matt Jennings. This note does not specify an interest rate, but includes "closing costs" of 5 percent as part of the principal amount due, and provides for interest of 19 percent per annum in the event of default in the payment of principal when due.

The fifth promissory note reflects that on July 27, 2005, Westmoore Capital, Inc., promised to pay Kim $60,000, on the maturity date of July 27, 2006—one year later. Interest payments of $2,000 were due on the 27th of each month, starting on July 27, 2005.[3] It provides that a default occurs if Westmoore Capital fails to pay the principal and interest on the maturity date.

The sixth promissory note reflects that on July 27, 2005, Westmoore Capital, Inc., *also* promised to pay Kim $100,000, on the maturity date of July 27, 2006—again, one year later. Interest payments of $2,000 were due on the 27th of each month, starting on July 27, 2005. It provides that a default occurs if Westmoore Capital fails to pay the principal and interest on the maturity date.

Nowhere does Kim allege that the maturity dates of any of these first six promissory notes were ever extended, either orally or in writing. By their terms, each required full payment of the indebtedness on dates between March of 2003 and July of 2006, inclusive—meaning the latest note was to be fully performed nearly three years prior to the filing of Kim's complaint.

The seventh promissory note reflects that on August 16, 2006, Temecula Harry's Pacific Grill, LLC, promised to pay Kim $1.25 million on the "maturity date," which is defined as being "at such time as Harry's Pacific Grill restaurant located in Temecula, CA and owned and operated by [Temecula Harry's Pacific Grill] is sold or substantially all of its assets are transferred, except for any transfer or sale to Westmoore Capital Group, LLC or any other Westmoore affiliated entity." Pending the maturity date, Temecula Harry's is obligated to pay interest at a rate of 12.5 percent per annum on the 15th of each month, but—remarkably—only so long as it has the "cash available" to do so.

---

[3] The terms of this promissory note are internally inconsistent with respect to the amount of interest to be paid, because it also states that interest "shall accrue at a rate per month equal to Two percent (2%.)" Two percent of $60,000 is $1,200 per month, not $2,000 per month. This discrepancy might be explained by the fact that the promissory note originally specified a principal obligation of $100,000, but was revised to reflect the lower amount of $60,000. The monthly interest payments, which would have correlated to 2 percent of $100,000, were not revised. They are thus inconsistent with the specified rate.

Also of note, any interest which is not paid when due "shall accrue and will be payable at such time as the Company has sufficient funds to pay any interest which is in arrears."

As additional consideration for this seventh promissory note, Kim was also entitled to "a prorated portion of 80% of the annual net income from the operation of the Temecula restaurant . . . in excess of $470,000," until such time as either Kim converted some or all of his loan into "membership interests" in Temecula Harry's Pacific Grill, or the loan principal was repaid. Finally, this seventh promissory note includes a provision specifying that it reflects the entire agreement between the parties with respect to the subject matter, supersedes all prior agreements and understandings, and cannot be amended except by signed written agreement.

While it is somewhat inconsistent with the conclusory allegation that defendants had no intention of repaying him, Kim also alleges that until approximately one year prior to the filing of the complaint (i.e., until Mar. of 2008), defendants did comply with their loan obligations. However, they allegedly stopped doing so "within the last year." With respect to defendants' alleged obligation to make monthly payments of $13,020.85, on an office building he owned, Kim specifically asserts that "as of January 2009, defendants were behind, by more than $78,125," a number which equates to six months of arrearages. Finally, Kim alleges that although he requested defendants disclose "where the investments were placed," they refused to specify, and refused to account for the money.

Kim's first cause of action is for breach of contract. In support of this claim, he incorporates all of his factual allegations, and further alleges that defendants "by their actions, payments, statements and signatures," became obligated to perform under the promissory notes attached as exhibit No. 1, and that "[a]fter making some payments, and agreeing to make further payments, defendants breached the contract . . . and said breach occurred within the last one year." As a result of the breach, he "suffered loss and harm."

Kim's second cause of action is for negligent misrepresentation and, in support of that cause of action, he incorporates all prior allegations, and further alleges "[d]efendants had a special relationship with [him]" and they undertook a duty to exercise due and reasonable care in "advising and speaking to [him]." Defendants allegedly breached that duty by "unreasonably and improperly fail[ing] to warn [him]" and "improperly advis[ing him.]" Kim alleges that he was harmed by these breaches and "reserves the right to perform discovery, and prove the extent and amount of damages caused by defendants."

Kim's third cause of action is for professional negligence and, in support of that cause of action, he incorporates all prior allegations, and further alleges that at all relevant times, defendants were "acting as investment brokers," and made numerous representations to him that he relied upon. He also alleges defendants "concealed material facts and material information from [him]," despite having "the ability to disclose true information." He asserts defendants acted unreasonably in failing to disclose true information. He alleges that he was "misled and relied upon the lack of full disclosure," and suffered consequent "loss and harm." He again reserves the right to "perform discovery, and present evidence of the full extent of loss and harm."

Kim's fourth cause of action is for conversion, and states, without explanation, that it is alleged "in the alternative." In support of that claim, Kim incorporates all prior allegations, and alleges additionally that "[i]nstead of using [Kim's] money as agreed for business purposes, defendants took the money, squandered the money, enjoyed the money and used the money for their own personal pleasure." Kim asserts defendants "formed the intent to misuse the money and to spend it, [and they] knew that their use of [his] money . . . was improper, unauthorized and unlawful." He alleges that defendants' conduct was "willful, wanton, malicious, oppressive and fraudulent," and claims an entitlement to punitive damages. Conversion is the only cause of action for which Kim seeks punitive damages.

Kim's final cause of action is for "unfair business practices."[4] In addition to incorporating all prior allegations, it is supported with additional allegations that defendants "are licensed investment brokers" and he is a "consumer and member of the general public." Defendants are alleged to "have violated Business [and] Professions Code section 17200," and to have "taken [his] money and wasted it, spent it and enjoyed it, for their own personal benefit." He alleges defendants "took advantage of [him], tricked [him] and fooled [him.]"

Kim's complaint specifies no amount of damages or harm caused to him by defendants' alleged actions, other than the failure to pay $13,020.85 per month, starting sometime in 2008, which amounted to an alleged debt of "more than $78,125" by January of 2009. However, when Kim served defendants with the complaint, on May 11, 2009, he also served each with a formal "Statement of Damages," which recites that it is for "personal injury or wrongful death," and which claims that Kim had suffered special damages consisting of "property damage" of $500,000, "unpaid fees" of $1.5 million, and "loan payments" of $2 million. Only the "loan payments" claim is

---

[4] Kim's purported fifth and sixth causes of action, for "Recision" (*sic*) and "Imposition of Constructive Trust," respectively, are both *remedies*, not causes of action.

consistent with the facts pleaded by Kim in his complaint.[5] The complaint includes no allegation of either property damage or unpaid fees of any kind. The statements also reflected that Kim reserved the right to seek punitive damages of $5 million against each defendant.[6]

Defendants did not timely respond to Kim's complaint. Kim requested and obtained entry of their defaults on August 13, 2009.

On November 19, 2009, defendants Westmoore Partners, Inc., Westmoore Capital, Inc., and Matt Jennings moved to set aside the defaults entered against them.[7] In support of their motions, these defendants asserted that at the time Kim commenced his lawsuit, Matt Jennings—who was also the president of both Westmoore entities, "was undergoing incredible financial and emotional hardships due to the current economic downturn . . . [and] was in near financial ruin and on the verge of filing for bankruptcy." The "extreme personal stress" this imposed on Jennings "caused him to be dilatory in engaging in [Kim's] lawsuit," and made dealing with it "an overwhelming impossibility, especially because at the time that [Kim] filed his Complaint, Jennings did not have the resources to hire legal counsel." However, these defendants asserted that "[i]n recent months," Jennings's health and financial outlook had "drastically improved," such that he had been able to hire legal counsel, and wished to defend the lawsuit.

Kim opposed the motion to vacate, and the court denied it. In its ruling, the court explained that the motion failed to cite a statutory basis for the relief, but it appeared relief could be available only on the basis of excusable neglect. The court felt Matt Jennings's declaration did "not sufficiently establish that [he] was ill, or even under a doctor's care at any point, such that he could not have avoided default through the exercise of ordinary care."

---

[5] The closest reference to "unpaid fees" we can find in the complaint is in the terms of the fourth promissory note, which specifies that $3,750 of "closing costs" are to be added to the principal amount of the loan. However, we cannot fathom how that single item of "closing costs" might correlate to the $1.5 million in "unpaid fees" set forth in the statement of damages. As for the alleged $500,000 in "property damage," there is simply nothing in the complaint which even arguably supports such a claim.

[6] Defendants assert in their opening brief that the statements of damages "were not properly served," and suggest that Kim may have acted inappropriately by "attach[ing] the proof of service of summons for the original complaint (Dated May 21, 2009) to Plaintiff's statements of damages which [were] filed more than a year later on June 25, 2010." But there was no impropriety in doing so. The proofs of service in question actually reflect that each defendant was served with both the complaint *and the statement of damages* (along with other documents) on May 11, 2009. And the statement of damages form states, on its face, that it should not be filed with the court "unless you are applying for a default judgment under Code of Civil Procedure § 585." Thus, it is perfectly proper to *serve* a statement of damages on one date, but not *file it* with the court until much later, when a default judgment is actually sought.

[7] The other three named defendants, Rob Jennings, Temecula Harry's Pacific Grill, LLC, and Honolulu Harry's, Inc., did not move to set aside their defaults.

Kim thereafter filed two separate requests for entry of a default judgment, each of which was rejected by the clerk due to inconsistent or incomplete paperwork. However, Kim's third attempt to secure a default judgment from the court was successful.

In support of that third attempt, Kim provided the court with the six statements of damages he served on defendants along with the complaint. Although each of those statements of damages set forth claims totaling $9 million, including punitive damages, Kim requested a judgment of only $5 million against each defendant, "for a total of $30 million." Kim made no effort to correlate that amount to any particular claim or promissory note, or even to explain the extent to which it represented compensatory and punitive damages. Instead, Kim's declaration simply stated that "[c]onsistent with the statement of damages, each defendant owes me at least $5 million." He goes on to explain that a judgment of $5 million against each defendant, for a total of $30 million, "would not be an excessive sum. [It] would be a reasonable sum, if they ever paid it. It would compensate me for some of the devastation caused by these defendants." And that is all it says. Otherwise, Kim merely states that "[his] attorney Mr. Donahue submits a declaration with Exhibit 1, dated October 26, 2009," and that he "concur[s] with that declaration and its contents are incorporate[d] herein by reference as those [sic] set forth at length."

Donahue's declaration, in turn, explains nothing about the damages incurred by Kim. Instead, it merely references the attached "Exhibit 1," which Donahue describes as "documentation regarding the damages" and "information" he "e-mailed to [defendants' counsel] on September 23, 2009."[8] Those documents consist of several pages of accounts, some of which consist solely of numbers, and others of which list dates and monetary sums, with references to "Maplewood," "Gil Kim" "Judy Kim," "LV Waterford Castle," and "Brigadoon rent." None of those references seems to correlate to any of the promissory notes appended to the complaint, and none of them is explained in any declaration. We have no evidence demonstrating who prepared the accounts, or when. In short, these documents are entirely unintelligible, and useless as evidence.

Kim filed this third prove-up package with the court on June 25, 2010. On July 19, the matter was assigned to a new judge. On July 21, that judge signed the judgment proposed by Kim, without any changes. The document states that "[j]udgment is hereby ordered in favor of plaintiff Gil Kim, and against each individual defendant listed below, in the single sum of

---

[8] Donahue's claim to have e-mailed exhibit No. 1 to opposing counsel on September 23, 2009, cannot be reconciled with Kim's characterization of the exhibit as being "dated October 26, 2009."

$5,000,000, plus costs of suit in the amount of $804.40, for the total sum of $5,000,804.40." It then lists the names of all six defendants.[9]

## I

Appellants Matt Jennings, Westmoore Partners, Inc., and Westmoore Capital, Inc. (collectively "the Westmoore defendants"), first challenge the court's denial of their motion to set aside the defaults entered against them. They rely upon the public policy favoring disposition of cases on their merits, and argue the court abused its discretion in denying them relief in this case. The Westmoore defendants argue because they moved for relief from the default promptly, and offered sufficient evidence of a reasonable excuse to justify that relief, the court was obligated to grant it.

We are not persuaded. First, as to the issue of promptness, the Westmoore defendants argue their motion was filed "within three weeks" of learning about the default, "as [they] did not receive Notice of Entry of Default from Plaintiff and it wasn't until Plaintiff filed his request for entry of judgment on October 26, 2009 . . . that [they] were made aware that default had been entered." But that claim, whether accurate or not, is not supported by the record. The declaration of Matt Jennings, which was the sole evidentiary support for the motion to set aside the defaults, contains no assertion that he did not receive notice of the entry of default. The trial court was consequently free to presume the Westmoore defendants actually received the notice of entry of default in August of 2009 and waited over three months (rather than three weeks) to do anything about it. While such a delay does not preclude relief, neither does it demonstrate particular promptness.

More significantly, Jennings's declaration, notable primarily for its brevity, amounts to nothing more than a conclusory assertion his "anxiety,

---

[9] Because the judgment was prepared by Kim, and it is clear from his declaration that he is seeking a total judgment of $30 million, we presume that is what is intended by the judgment. However, in our view, the language of the judgment is ambiguous. It specifies that judgment is entered against "each individual" defendant, but in the "single" sum of $5 million. Removing the words "each individual" would make it clear that the total liability is $5 million, assessed jointly and severally against all defendants; and removing the word "single" would make it clear that the total liability is $30 million—consisting of $5 million assessed against each defendant severally. However, including both words in the same sentence makes it unclear. Moreover, the judgment's treatment of costs exacerbates the confusion. The total amount of costs claimed by Kim in this case was $804.40, and the judgment adds those costs to the "single sum" of $5 million, for a "total sum of $5,000,804.40." If that "total sum" is assessed against *each defendant separately*—consistent with the $30 million in damages requested by Kim—that means Kim would be entitled to recover his costs six times over. That is clearly inappropriate. We need not resolve this ambiguity, however, because, as we have already indicated, the judgment must be reversed in any case.

depression, and financial hardships" caused the Westmoore defendants to be "dilatory in answering [the] lawsuit." He offers no *evidentiary* facts about either his emotional or financial state, which the court might have been able to assess in determining whether his failure to respond was actually excusable in the circumstances. As such, the declaration was insufficient to support relief. (*United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1018 [118 Cal.Rptr.3d 834] [a declaration consisting of only a recitation of legal conclusions and ultimate facts, without any evidentiary facts, was insufficient to establish a triable issue of fact to defeat summary judgment]; *Hayman v. Block* (1986) 176 Cal.App.3d 629, 640 [222 Cal.Rptr. 293] [declarations containing "general and vague charges" do not qualify as "competent or credible evidence"].)

The trial court focused on this very issue in its order denying relief, noting that "[t]he declaration does not sufficiently establish that [Matt Jennings] was ill, or even under a doctor's care at any point, such that he could not have avoided default through the exercise of ordinary care." On the record before us, we cannot say the trial court erred in that conclusion.

## II

Next, all six appellants argue that even if the entry of their defaults was valid, the default judgment must nonetheless be reversed. On this point, they fare substantially better.

We begin with the basic guidelines for analyzing the legal effect of a default. "Substantively, '[t]he *judgment by default* is said to "confess" the material facts alleged by the plaintiff, i.e., the defendant's failure to answer has the same effect as an express admission of *the matters well pleaded in the complaint.*' " (*Steven M. Garber & Associates v. Eskandarian* (2007) 150 Cal.App.4th 813, 823 [59 Cal.Rptr.3d 1], second italics added.) The "well-pleaded allegations" of a complaint refer to " ' "all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." ' " (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 [40 Cal.Rptr.3d 205, 129 P.3d 394], quoting *Serrano v. Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241].)

Because the default *confesses* those properly pleaded facts, a plaintiff has no responsibility to provide the court with sufficient evidence to prove them—they are treated as true for purposes of obtaining a default judgment. (*Ostling v. Loring* (1994) 27 Cal.App.4th 1731, 1746 [33 Cal.Rptr.2d 391].) But that is all the default does. There is no penalty for defaulting. "A defendant has the right to elect not to answer the complaint. (*Greenup v. Rodman* [(1986)] 42 Cal.3d [822,] 829 [231 Cal.Rptr. 220, 726 P.2d 1295].)

Although this may have been a tactical move by defendant, it is a permissible tactic." (*Stein v. York* (2010) 181 Cal.App.4th 320, 325 [105 Cal.Rptr.3d 1].)

And if the well-pleaded allegations of the complaint do not state any proper cause of action, the default judgment in the plaintiff's favor cannot stand. On appeal from the default judgment, "[a]n objection that the complaint failed to state facts sufficient to constitute a cause of action may be considered." (*Bristol Convalescent Hosp. v. Stone* (1968) 258 Cal.App.2d 848, 859 [66 Cal.Rptr. 404]; see *Martin v. Lawrence* (1909) 156 Cal. 191 [103 P. 913].) Moreover, "[w]hen considering the legal effect of those facts, we disregard any erroneous or confusing labels employed by the plaintiff." (*Mead v. Sanwa Bank California* (1998) 61 Cal.App.4th 561, 564 [71 Cal.Rptr.2d 625], citing *Saunders v. Cariss* (1990) 224 Cal.App.3d 905, 908 [274 Cal.Rptr. 186].)

In this case, a review of Kim's complaint reveals it does not set forth any valid cause of action. Although Kim purports to state several different causes of action, the gravamen of his complaint is breach of contract. He alleges defendants, acting in concert, entered into various agreements with him to borrow increasing sums of money over a period of time, promising him substantial returns, but then breached their repayment obligations within the year prior to the filing of his complaint.

In support of that claim, Kim incorporates by reference seven written promissory notes which reflect defendants' alleged indebtedness to him. And that is where the trouble begins. When a plaintiff attaches a written agreement to his complaint, and incorporates it by reference into his cause of action, the terms of that written agreement take precedence over any contradictory allegations in the body of the complaint. "If facts appearing in the exhibits contradict those alleged, the facts in the exhibits take precedence." (*Holland v. Morse Diesel Internat., Inc.* (2001) 86 Cal.App.4th 1443, 1447 [104 Cal.Rptr.2d 239], citing *Mead v. Sanwa Bank California, supra,* 61 Cal.App.4th 561, 567–568.)

Here, the first six of the seven promissory notes Kim incorporated into his complaint specify that defendants were obligated to repay the subject debt, in full, on dates *between three and six years prior to the date he filed his complaint,* and nowhere does Kim allege that the maturity dates for any of those obligations were ever extended. Consequently, those first six promissory notes could not, by their terms, have been breached within a year prior to Kim's filing of the complaint. They were breached—if at all—years earlier. The complaint therefore states no cause of action for breach of those first six promissory notes.

The seventh promissory note, in the amount of $1.25 million, fares no better as a basis for Kim's breach of contract claim. Although that agreement *could* have been breached within the year prior to Kim's filing of his complaint, he alleges no facts demonstrating that it actually was. By its terms, the seventh promissory note requires payment of the principal amount only when "Harry's Pacific Grill restaurant located in Temecula, CA and owned and operated by [Temecula Harry's Pacific Grill] is sold or substantially all of its assets are transferred . . . ." Kim does not allege that ever happened.

Pending that maturity date, the seventh promissory note required payment of interest at a rate of 12.5 percent per annum on the 15th of each month, *but only so long as defendant Temecula Harry's Pacific Grill had the "cash available" to do so*. And any interest which is not paid when due would "accrue and will be payable at such time as [Temecula Harry's Pacific Grill] has sufficient funds to pay any interest which is in arrears." Kim did not allege that Temecula Harry's ever had the "cash available" to make those interest payments or "sufficient funds" to pay interest arrearages. Consequently, he had not alleged any facts demonstrating a breach of this promissory note.

What Kim does allege is that, in exchange for his loan of $1.25 million, defendants promised to make his loan payments on a commercial property. He claims they breached the agreement when they stopped making those loan payments. That allegation, being entirely inconsistent with the terms of the seventh promissory note, must be disregarded as a basis for establishing its breach, especially given that the promissory note includes a provision specifying that it reflects the entire agreement between the parties with respect to the subject matter, that it supersedes all prior agreements and understandings, and that it cannot be amended except by signed written agreement.

In short, Kim has alleged no facts establishing any defendant breached the terms of any of the promissory notes he attaches to his complaint, and his complaint thus fails to state a cause of action for breach of contract.

Kim's next cause of action is for negligent misrepresentation, stated in terms which are entirely conclusory. Kim alleges that defendants "advised him on what to do and how to proceed," and "recommend[ed] investments and loan strategies to [him.]" They allegedly breached their duty of due care "in addressing, advising and speaking to [him] . . . [¶] . . . by failing to properly advise him." If we ignore the " ' "contentions, deductions or conclusions of fact or law . . . [citation]" ' " contained in this purported cause of action (*Evans v. City of Berkeley, supra*, 38 Cal.4th at p. 6), there is simply nothing left. Specifically, Kim fails to allege what factual representations were made to him or any facts suggesting that reasonable persons in

defendants' position should have known those representations were untrue at the time they made them. Consequently, no cause of action is stated.

■ Kim's third cause of action, for "professional negligence," fails because its key allegation—that "[a]t all times herein, defendants were acting as investment brokers"—is squarely contradicted by the terms of the promissory notes he incorporated into the complaint. Those promissory notes make clear that defendants were not "brokering" any investments. (See *UFITEC, S.A. v. Carter* (1977) 20 Cal.3d 238, 244 [142 Cal.Rptr. 279, 571 P.2d 990], italics added ■ [noting the definition of a securities broker is a " 'person engaged in the business of effecting transactions in securities *for the account of other*' "]; Bus. & Prof. Code, § 10131, italics added [defining a real estate broker as one who "does or negotiates to do one or more . . . acts *for another or others*"].) Instead, the promissory notes unambiguously establish that the relationship between Kim and defendants was simply one of creditor-debtors.

■ Kim's fourth cause of action, for conversion, fails because the simple failure to pay money owed does not constitute conversion. A cause of action for conversion of money can be stated only where a defendant interferes with the plaintiff's *possessory interest* in a specific, identifiable sum, such as when a trustee or agent misappropriates the money entrusted to him. " 'Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment. [Citation.]' (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1491 [49 Cal.Rptr.3d 227]; see *Haigler v. Donnelly* (1941) 18 Cal.2d 674, 681 [117 P.2d 331]; *Fischer v. Machado* (1996) 50 Cal.App.4th 1069, 1072–1074 [58 Cal.Rptr.2d 213] [sales agent liable for conversion of proceeds from consignment sale of farm products]; *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.* (1996) 49 Cal.App.4th 472, 485 [56 Cal.Rptr.2d 756] ['money cannot be the subject of a conversion action unless a specific sum capable of identification is involved.'].) A 'generalized claim for money [is] not actionable as conversion.' (*Vu v. California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229, 235 [68 Cal.Rptr.2d 31]; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 703, pp. 1026–1027.) [¶] . . . [¶] California cases permitting an action for conversion of money typically involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others. (See, e.g., *Haigler v. Donnelly, supra*, 18 Cal.2d at p. 681 [real estate broker]; *Fischer v. Machado, supra*, 50 Cal.App.4th at pp. 1072–1074 [sales agent for consigned farm products]; *Weiss v. Marcus* (1975) 51 Cal.App.3d 590, 599 [124 Cal.Rptr. 297] [attorney's claim for $6,750 fees from proceeds of settlement subject to lien]; *Watson v. Stockton Morris Plan Co.* (1939) 34 Cal.App.2d 393, 403 [93 P.2d 855] [savings and loan issued duplicate passbook and delivered funds to third party].)" (*PCO,*

*Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 395–396 [58 Cal.Rptr.3d 516]; see also *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc., supra*, 49 Cal.App.4th at p. 485 [no claim for conversion is stated where money was allegedly misappropriated "over time, in various sums, without any indication that it was held in trust for" plaintiff]; *McKell v. Washington Mutual, Inc., supra*, 142 Cal.App.4th at pp. 1491–1492 [bank's practice of overcharging customers for third party fees, and retaining the difference, did not constitute a conversion of customers' funds, since the bank had not violated any duty to distribute the disputed funds to the third parties].)

In this case, Kim did not allege he entrusted funds to defendants for a specific purpose, and the promissory notes he incorporated into the complaint demonstrate beyond dispute that this case actually involves a simple creditor-debtor relationship, in which defendants are alleged to have violated their obligations to repay the subject debts. Those facts do not constitute a claim defendants interfered with Kim's possession of a specific, identifiable sum of money. Thus, no cause of action for conversion was stated.

■ Finally, Kim has also failed to state a valid cause of action for "unfair business practices." What he asserts as the basis of this purported claim is that "[d]efendants are licensed investment brokers" and "have violated Business [and] Professions Code section 17200." However, Business and Professions Code section 17200 does not actually prohibit any conduct. It is merely definitional.[10] No cause of action can be stated for violating a statutory definition. An action for unfair competition must refer to one of the sections *following* Business and Professions Code section 17200.

Kim alleges that defendants "have engaged in wrongful, improper, illegal and unreasonable business practices," have "taken [his] money and wasted it, spent it and enjoyed it, for their own personal benefit," and have "[taken] advantage of [him]," "tricked [him]," and "fooled [him]." These allegations are entirely vague, conclusory, and do not amount to any cognizable claim. Moreover, Kim alleged no facts which would support his implied assertion defendants were prohibited from doing whatever they wanted with the money he loaned them. Their only obligation, as set forth in the promissory notes, was to pay the money back in accordance with the terms of those notes. Their alleged failure to do that does not qualify as an "unfair business practice."

---

[10] Business and Professions Code section 17200 states: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

Because Kim's complaint does not state any cognizable cause of action against defendants, it does not support any judgment in his favor.

### III

■ But Kim's problems do not end there, because his complaint also fails to set forth any clear demand for damages, let alone one which would support the enormous judgment he obtained from the trial court. As this court has iterated and then reiterated, Code of Civil Procedure section 580 prohibits the entry of a default judgment in an amount in excess of that demanded in the complaint. (*Stein v. York, supra,* 181 Cal.App.4th 320; *Electronic Funds Solutions, LLC v. Murphy, supra,* 134 Cal.App.4th at p. 1173; *Sole Energy Co. v. Hodges* (2005) 128 Cal.App.4th 199, 206, fn. 4 [26 Cal.Rptr.3d 823].)

Moreover, we have also made it clear that a statement of damages cannot be relied upon to establish a plaintiff's monetary damages, except in cases of personal injury or wrongful death. "Statements of damages are used only in personal injury and wrongful death . . . . [Citation.] In all other cases, when recovering damages in a default judgment, the plaintiff is limited to the damages specified in the complaint. [Citations.]" (*Sole Energy Co. v. Hodges, supra,* 128 Cal.App.4th at p. 206, fn. 4; see *Electronic Funds Solutions, LLC v. Murphy, supra,* 134 Cal.App.4th at p. 1173; see also *Levine v. Smith* (2006) 145 Cal.App.4th 1131, 1136–1137 [52 Cal.Rptr.3d 197].)

■ Here, the only damage numbers included in Kim's complaint are found in his allegation defendants defaulted on their obligations to make monthly payments on his commercial property, in consideration of his agreement to loan them $1.25 million. Kim alleges defendants' failure to do that caused him damages of "more than $78,125." However, as we have already explained, Kim's complaint states no valid claim for breach of that purported obligation, since it is inconsistent with the terms of the promissory note he incorporated into the complaint, which governs that particular loan. Consequently, Kim's complaint supports no award of damages at all.

■ As explained in *Ostling v. Loring, supra,* 27 Cal.App.4th at page 1743, "Ordinarily when a judgment is vacated on the ground the damages awarded exceeded those pled, the appropriate action is to modify the judgment to the maximum amount warranted by the complaint." (See also *Finney v. Gomez* (2003) 111 Cal.App.4th 527 [3 Cal.Rptr.3d 604].) In this case, that maximum is zero.

### IV

And finally, even if Kim's complaint were sufficient to support a judgment in his favor, he would still be facing reversal of that judgment on appeal,

because he failed to provide the court with sufficient evidence to "prove up" his entitlement to any damages.

 Code of Civil Procedure section 585 sets forth the two options for obtaining a default judgment. First, where the plaintiff's complaint seeks compensatory damages only, in a sum certain which is readily ascertainable from the allegations of the complaint or statement of damages, the clerk may enter the default judgment for that amount. (Code Civ. Proc., § 585, subd. (a).) A clerk's judgment is appropriate only in cases where the determination of damages is a purely ministerial act, i.e., where there is "some definite, fixed amount of damages or where such may be ascertained by computation made by the clerk. If evidence must be taken to establish the amount due . . . , the clerk may not render judgment." (*Ford v. Superior Court* (1973) 34 Cal.App.3d 338, 342 [109 Cal.Rptr. 844].)

However, if the relief requested in the complaint is more complicated than that, consisting of either nonmonetary relief, or monetary relief in amounts which require either an accounting, additional evidence, or the exercise of judgment to ascertain (such as emotional distress damages, pain and suffering, or punitive damages), the plaintiff must request entry of judgment by the court. (Code Civ. Proc., § 585, subd. (b).) In such cases, the plaintiff must affirmatively establish his entitlement to the specific judgment requested. "The court shall hear the evidence offered by the plaintiff, and shall render judgment in the plaintiff's favor for that relief, not exceeding the amount stated in the complaint, in the statement required by Section 425.11, or in the statement provided for by Section 425.115, *as appears by the evidence to be just.* If the taking of an account, or the proof of any fact, is necessary to enable the court to give judgment or to carry the judgment into effect, the court may take the account or hear the proof, or may, in its discretion, order a reference for that purpose. If the action is for the recovery of damages, in whole or in part, the court may order the damages to be assessed by a jury; or if, to determine the amount of damages, the examination of a long account is involved, by a reference as above provided." (*Ibid.*, italics added.)

And while Code of Civil Procedure section 585 does give the court discretion to "permit the use of affidavits, in lieu of personal testimony, as to all or any part of the evidence or proof required or permitted to be offered, received, or heard in those cases," it specifically requires that "[t]he facts stated in the affidavit or affidavits shall be within the personal knowledge of the affiant and *shall be set forth with particularity*, and each affidavit shall show affirmatively that the affiant, if sworn as a witness, can testify competently thereto." (Code Civ. Proc., § 585, subd. (d), italics added.)

In this case, that did not happen. Instead, as we have already explained, Kim's prove-up evidence consisted of nothing more than his own conclusory

demand for $5 million dollars from each defendant—a demand that bore absolutely no relationship to the allegations of his complaint. Additionally, Kim's counsel offered the court a sheaf of documents which he claimed to have transmitted to opposing counsel at some earlier point. Those documents were not only unintelligible, but also unsupported by any foundation suggesting how, when, or by whom they were created. They were consequently useless as evidence.

On appeal, defendant may challenge the sufficiency of the evidence offered to support the default judgment. "Plaintiffs in a default judgment proceeding must prove they are entitled to the damages claimed." (*Barragan v. Banco BCH* (1986) 188 Cal.App.3d 283, 302 [232 Cal.Rptr. 758], citing Code Civ. Proc., § 585 & *Taliaferro v. Hoogs* (1963) 219 Cal.App.2d 559, 560 [33 Cal.Rptr. 415].)

Although some cases have recited a "general rule that sufficiency of the evidence [tendered in a default proceeding] cannot be reviewed on an appeal from a default judgment" (e.g., *Uva v. Evans* (1978) 83 Cal.App.3d 356, 363 [147 Cal.Rptr. 795]), that rule applies only "as to matters for which no proof is required by virtue of the admission by default of the allegations of the complaint." (*Ostling v. Loring, supra*, 27 Cal.App.4th at p. 1745.) "However, as to damages which, despite default, require proof the general rule does not apply." (*Ibid.*)

Indeed, the *Uva* court itself departs from the so-called general rule in concluding that defendants can challenge the sufficiency of the evidence to support the damage award in that case. As explained by the court, such a challenge is proper because "the right to appellate review flows logically from the fact that damages must be proved in the trial court before the default judgment may be entered. ([Code Civ. Proc.,] § 585, subd. 2.) The requirement of proof of damages is meaningless if it can be fulfilled by any evidence, even evidence which results in a judgment prompted by 'passion, prejudice or corruption.' Yet without appellate review, such a judgment would stand. . . . While the role of the appellate court in reviewing damages is much more limited than that of the trial court reviewing a jury verdict, the policies which sanction such review are not dissimilar: just as the trial court need not sit idly by and watch injustice be done through an improper award by the jury, we know of no statutory or constitutional barrier which requires an appellate court to ignore gross injustice in the award of damages simply because the judgment was procured by way of default." (*Uva v. Evans, supra*, 83 Cal.App.3d at p. 364, italics omitted; see also *Scognamillo v. Herrick* (2003) 106 Cal.App.4th 1139, 1150 [131 Cal.Rptr.2d 393] ["the issue of speculative damages is subject to review where, as here, the damages

awarded are unsupported by sufficient evidence"]; *Finney v. Gomez, supra,* 111 Cal.App.4th at p. 547.)[11]

Appellants here have challenged the sufficiency of the evidence to support the damages awarded to Kim, and they were right to do so. Kim's effort to prove up his damages was wholly insufficient to sustain any award of damages in his favor.

" 'When the plaintiff has had full and fair opportunity to present the case, and the evidence is insufficient as a matter of law to support plaintiff's cause of action, a judgment for defendant is required and no new trial is ordinarily allowed, save for newly discovered evidence. . . . Certainly, where the plaintiff's evidence is insufficient as a matter of law to support a judgment for plaintiff, a reversal with directions to enter judgment for the defendant is proper.' " (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 919 [52 Cal.Rptr.3d 126], quoting *McCoy v. Hearst Corp.* (1991) 227 Cal.App.3d 1657, 1661 [278 Cal.Rptr. 596]; accord, *Avalon Pacific—Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC* (2011) 192 Cal.App.4th 1183 [122 Cal.Rptr.3d 417]; *Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 833 [57 Cal.Rptr.3d 430].)

Based upon the foregoing authorities, appellants are entitled to entry of judgment in their favor.

## V

After appellants' counsel filed their opening brief, Kim's counsel, Timothy J. Donahue, requested an extension of time to file his respondent's brief. In that request for extension, Donahue explained—under penalty of perjury—that additional time was required to file the brief because of the many "complex issues raised" by appellants and his "[n]eed [for] more time to research cases & finalize brief. . . ." He also cited "other time commitments of counsel." The extension was granted.

---

[11] We found the "general rule" prohibiting review of the sufficiency of the evidence to support a default judgment cited in two modern cases. The first, *In re Matthew S.* (1988) 201 Cal.App.3d 315, 320 [247 Cal.Rptr. 100], is a juvenile dependency case, which relies on *Uva v. Evans, supra,* 83 Cal.App.3d 356, 363, as authority for that general rule, without acknowledging the fact that *Uva* itself actually allows such a challenge relating to damages. *In re Matthew S., supra,* 201 Cal.App.3d 315, is then cited, in turn, for the same proposition by *Sporn v. Home Depot USA, Inc.* (2005) 126 Cal.App.4th 1294 [24 Cal.Rptr.3d 780], a case involving an appeal from a trial court order denying a motion to vacate a default judgment. The *Sporn* court goes on to acknowledge, however, that various courts have allowed a challenge to the sufficiency of the evidence in a *direct appeal* from a default judgment, and then simply distinguishes that situation from the one before it, in which the defendant forfeited any direct appeal. Neither of these cases constitutes persuasive authority precluding review of the sufficiency of the evidence to support the damage award in this case.

However, when Donahue filed his brief, it belied his claim that he had been engaged in any significant research in connection with this appeal, as well as his claim of needing any significant time to "finalize" his brief. In fact, Donahue's brief proved to be an almost verbatim duplicate of another brief he filed with this court in September of 2009, in the case of *Nguyen v. Castillo* (May 12, 2010, G041494) (nonpub. opn.).[12]

The earlier brief was filed in a case in which the appellant argued only that he had not received proper notice of the lawsuit, and sought relief from the default, and the ensuing judgment, solely on that basis. Unlike this appeal, the earlier one raised no objections to the substance of the judgment entered, or the sufficiency of the evidence to support it. Nonetheless, every case cited in Donahue's current brief was cited in that earlier brief. The lack of attention Donahue paid to his brief in this case can perhaps best be illustrated by two things: First, Donahue includes the assertion that "[t]he defendants in this case got more than actual notice. The defendants were personally familiar with the events *and the accident.*" This case, of course—unlike Donahue's earlier case—involved no "accident." And second, Donahue's signature on the brief in this case reflects he is acting on behalf of "Plaintiff/Respondent PABLO CASTILLO"—his client in the earlier case.

Equally disturbing, both briefs contain an *identical* accusation that appellants' counsel is guilty of "false[ly] arguing the case." In this case, that assertion—which seemingly amounts to an accusation that appellants' counsel engaged in professional misconduct, is backed up by precisely nothing. The six sentences which comprise the "false argument" section of the brief do not identify even one alleged falsehood.

Both briefs also contain an identical—and we mean *word-for-word identical*—assertion that the appeal is frivolous, and a request for sanctions in the amount of $20,000.[13] This assertion is utterly inconsistent with Donahue's prior contention, in his request for extension of time, that the issues raised by appellants in this case were "complex," and required significant time to research. *Frivolous* claims, by their nature, do not require significant research to rebut.

---

[12] Appellants assert the two briefs differ in only 15 words. We have not undertaken such an analysis, but appellants' estimate is not outside the ballpark. The two are virtually identical. Appellant's request that we take judicial notice of that earlier brief is granted.

[13] The only difference in the sanction requests is a technical one. While both briefs assert "[a]ll parties have been put on notice of the pending request for sanctions, as a result of frivolous appeal," the earlier brief in the *Nguyen v. Castillo* case actually references a letter sent by Donahue to opposing counsel providing such a notice. Apparently, Donahue sent no such letter to opposing counsel in this case, an omission which did not deter him from making the identical assertion of "notice."

After Donahue filed the boilerplate brief, appellants filed their request that this court take judicial notice of the earlier brief in the *Nguyen v. Castillo* case. After review of that brief, we issued a notice pursuant to California Rules of Court, rule 8.276, informing Donahue that we were considering the imposition of sanctions against him, for unreasonable violations of the California Rules of Court, rules 8.63 and 8.212(b)(3) (hereinafter rule 8.63 and rule 8.212(b)(3), respectively), which govern requests for extensions of time, and rule 8.204(a)(1) (hereinafter rule 8.204(a)(1)), which governs the contents of briefs.[14]

Donahue filed a letter brief in response to our notice. In conclusory terms, he simply denied violating "any provision" cited in our notice. He then used the letter as a further opportunity to argue for sanctions *against appellants*, asserting that "[t]he appeal was obviously filed as a delay tactic," and inaccurately criticizing appellants' counsel for making "several mistakes in their brief."[15]

Donahue defended his decision to simply copy his brief from the earlier case, stating, "I have the right to modify my own work product," and summarizing his strategy as "[s]ame issue, same brief, should be the same ruling."

In closing, Donahue asserted that our sanctions notice must have been erroneous, that it was probably intended to target " 'appellants' counsel,' instead of respondents," since "[i]t was respondents who requested sanctions against appellants, not the other way around." He again characterized the appeal as "frivolous," and as having "no merit."

When the time came for hearing on the possible sanctions, not only did Donahue not appear, he sent counsel who was unaware that sanctions were being considered against Donahue. That attorney informed us he had not been told sanctions were being considered, and he was prepared only to submit the matter on Donahue's briefing of the merits. We had to issue a second order to get Donahue to appear personally on the sanctions issue.

 Rule 8.63 sets forth the policies applicable to requests for extensions of time in the appellate courts, and contains a list of factors to be considered in determining whether "good cause" for an extension of time has been shown. Rule 8.63(b)(4) requires that an extension request based upon the

---

[14] California Rules of Court, rule 8.276(a) provides that the court may, on its own motion, impose sanctions on a party for "[f]iling a frivolous motion" or "[c]ommitting any other unreasonable violation of these rules."

[15] In making this assertion, Donahue relies on a "notice of errata" filed by appellants, which acknowledges *one* clerical error in the brief, and corrects it.

"number and complexity of the issues raised" "must specify the issues." Rule 8.63(b)(9) requires that an extension request based upon counsel's time constraints cannot be based on "[m]ere conclusory statements that more time is needed because of other pressing business . . . ."

 Rule 8.212(b)(3)(A) sets forth the procedural requirements for obtaining an extension of time, specifying that a party applying for an initial extension of time must show the court that he "was unable to obtain—or it would have been futile to seek—the extension by stipulation . . . ."

Both of those rules were violated in Donahue's extension request in this case. He failed to specify the complex issues he claimed required additional time to research; he failed to make more than a conclusory assertion that he had "other time commitments," and he failed to demonstrate any effort to obtain a stipulation to the extension request.

 Donahue is certainly not the only counsel to stint on detail in support of a request for extension of time. As this case exemplifies, we try to accommodate such requests, even when the technical requirements of the request are not fully satisfied, especially when the opposing party registers no objection. It is simply more efficient, and generally more fair to the parties, for us to do so. Consequently, not every violation of these rules rises to the level of sanctionable conduct. (See *Huschke v. Slater* (2008) 168 Cal.App.4th 1153, 1162 [86 Cal.Rptr.3d 187] ["To be sure, not every violation of a procedural rule is properly sanctionable, as some may be the result of excusable inadvertence or exigent circumstances and/or relatively inconsequential."].)

However, what distinguishes this case from the run-of-the-mill violation, is that Donahue's subsequent filing of what is essentially a copy of a brief he filed in an earlier case—and one which does not, in fact, address any of the "complex" issues actually raised in this appeal—demonstrates that the justifications offered for his extension request were not merely cursory, but prevaricative. The brief Donahue ultimately filed herein did not reflect *any* research of complex issues, and its preparation simply could not have claimed *any* significant amount of his time. His conclusory claims to the contrary, in support of his extension request, were—not to put too fine a point on it—untrue.

We cannot overlook such conduct. It is critical to both the bench and the bar that we be able to rely on the honesty of counsel. The term "officer of the court," with all the assumptions of honor and integrity that append to it, must not be allowed to lose its significance. While some might find these to be only "little" lies, we feel the distinction between little lies and big ones is

difficult to delineate and dangerous to draw. The corrosive effect of little lies differs from the corrosive effect of big lies only in the time it takes for the damage to become irreversible. Donahue's violations of the requirements set forth in the California Rules of Court governing extension requests meet the standard of unreasonableness, and warrant the imposition of sanctions.

The same conclusion applies to Donahue's violation of rule 8.204(a)(1), which specifies the required content of a brief. Among other things, it requires that briefs must "support each point by argument and, if possible, by citation of authority . . . ." (Rule 8.204(a)(1)(B).) In this case, Donahue's brief fails to meet that standard in significant ways. First, it includes a separately captioned argument asserting this appeal is frivolous and seeking an award of sanctions, but without including therein any discussion of either the facts of the case, or the law pertaining to sanctions. And second, the brief includes a separately captioned argument asserting that appellants have "falsely argue[d] the case," again without including any meaningful analysis—either factual or legal—to justify that accusation in the context of this case. And what makes these violations *unreasonable* is the clear evidence that Donahue simply copied these arguments from the earlier brief he submitted in the *Nguyen v. Castillo* case. The circumstances suggest he did not even pause to consider whether they were appropriate points to make in response to this appeal.

In fact, a comparison of his "falsely argue[d]" section in the two briefs reveals that Donahue constructed the argument in this case by simply *redacting the facts* recited in the earlier brief, and reproducing the bellicose rhetoric without any reference to anything that actually happened here. In other words, Donahue reduced this misconduct accusation to boilerplate.

It is difficult for us to express how wrong that is. Sanctions are serious business. They deserve more thought than the choice of a salad dressing. "I'll have the sanctions, please. No, on second thought, bring me the balsamic; I'm trying to lose a few pounds." A request for sanctions can *never* be so lightly considered as to be copied word for word from another brief—much less copied in reliance on facts from another case that do not obtain in the present one. A request for sanctions should be reserved for serious violations of the standard of practice, not used as a bullying tactic.

Our profession is rife with cynicism, awash in incivility. Lawyers and judges of our generation spend a great deal of time lamenting the loss of a golden age when lawyers treated each other with respect and courtesy. It is time to stop talking about the problem and act on it. For decades, our profession has given lip service to civility. All we have gotten from it is tired lips. We have reluctantly concluded lips cannot do the job; teeth are required. In this case, those teeth will take the form of sanctions.

We do not come to this conclusion lightly. Judges are lawyers, too. And while we have taken on a different role in the system, we have not lost sight of how difficult it is to practice law. Indeed, at the appellate level, we are reminded daily how complex and recondite the issues that confront practitioners daily can be.

So we are loath to act in any way that would seem to encourage courts to impose sanctions for mistakes or missteps. But for serious and significant departures from the standard of practice, for departures such as dishonesty and bullying, such steps are necessary. We will step onto the slippery slope and trust our colleagues on the trial court bench to tread carefully along with us. It is time to make it clear that there is a price to pay for cynical practices.

If this be quixotic, so be it. Rocinante is saddled up and we are prepared to tilt at this windmill for as long as it takes.

We sanction Mr. Donahue in the amount of $10,000. In arriving at that amount, we have struggled with the absence of precedent. "How much do you sanction an attorney who lies to the court, seeks unwarranted sanctions, bullies opposing counsel, shows no remorse, and effectively vows to continue such tactics by endorsing his conduct when challenged on it?" does not seem to have been a question yet addressed by other courts.

The appellate sanctions we have found involving sanctions paid to the court rather than opposing counsel[16] have ranged of late from $6,000 to $12,500. These are mostly sanctions for frivolous appeals, based in part on the cost to the court of processing a frivolous appeal (see, e.g., *Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181 [129 Cal.Rptr.3d 421]; *Pierotti v. Torian* (2000) 81 Cal.App.4th 17 [96 Cal.Rptr.2d 553]). Those cases, however, did not involve the added elements of dishonesty and lack of remorse we have here. And they did not require additional settings to bring the offending attorney before the court. The only case we have found that included those elements is, lamentably, from our own district, *DeRose v. Heurlin* (2002) 100 Cal.App.4th 158 [122 Cal.Rptr.2d 630].

In *DeRose*, a different panel of this court took into consideration its difficulty in getting counsel into court and his complete lack of compunction about his horrifying conduct in assessing what it termed a "conservative" sanction of $6,000. Given the passage of time, the out-and-out deceit, and the similar level of defiance involved in this case, we consider the amount we have chosen appropriate. Counsel's conduct clearly rises to the level of an

---

[16] Sanctions payable to opposing counsel typically involve amounts much higher than sanctions payable to the court. Appellant here did not request sanctions.

unreasonable violation of rule 8.204(a)(1), and for this and the other violations outlined above, we impose monetary sanctions against him in the amount of $10,000, payable to this court within 90 days.

The judgment is reversed, and the case is remanded to the trial court with instructions to enter judgment in favor of appellants. Appellants are to recover their costs on appeal.

The court having found that Timothy J. Donahue, State Bar No. 110501, has violated court rules in such a degree as to require sanctions in the amount of $10,000, the clerk of this court is ordered, pursuant to Business and Professions Code section 6086.7, subdivision (a)(3), to forward a copy of this opinion to the State Bar upon return of the remittitur, and to notify Mr. Donahue that the matter has been referred to the State Bar.

Moore, J., and Fybel, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 14, 2012, S199199.