Filed 6/27/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| INTERSTATE SPECIALTY MARKETING, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> ICRA SAPPHIRE, INC., <br><br> Defendant and Respondent. | G047376 <br><br> (Super. Ct. No. 30-2011-00495173) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, David R. Chaffee, Judge. Reversed with directions.

Logan Retoske and William R. Mitchell for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

\* \* \*

Sanctions are a judge's last resort. At bottom, they are an admission of failure. When judges resort to sanctions, it means we have failed to adequately communicate to counsel what we believe the law requires, failed to impress counsel with the seriousness of our requirements, and failed even to intimidate counsel with the fact

we hold the high ground: the literal high ground of the bench and the figurative high ground of the state's authority. We don't like to admit failure so we sanction reluctantly.

But sanctions can level the playing field. If we do not take action against parties and attorneys who do not follow the rules, we handicap those who do. If we ignore transgressions, we encourage transgressors. So sanctions serve a purpose other than punishment. If we cannot convince attorneys to conduct themselves honorably and ethically by appealing to their character, we can sometimes bring them into line by convincing them that obeying the rules is the route of least resistance – the less expensive alternative.

This case illustrates what happens when we turn to sanctions too quickly. The trial judge here, understandably chagrined by the rather dilatory pace at which the case was being prosecuted, imposed sanctions pursuant to Code of Civil Procedure[1] section 128.7 against plaintiff's counsel – on his own motion. The result was three different kinds of error.

One, the text of section 128.7 clearly gives an attorney 21 days to correct a pleading otherwise sanctionable under the statute, and that 21 days plainly runs from the *service* of the order to show cause (OSC) threatening the sanctions. Here, the motion to amend was filed (on June 5, 2012), 17 days *prior* to the trial court's even setting the OSC regarding sanctions, and granted on the very day the court set the OSC (June 22, 2012). (§ 128.7, subd. (c)(2).)

Two, attaching the wrong draft of a contract even to a verified complaint does not appear to be, under the particular circumstances of this case and the text of the statute, sanctionable at all. (§ 128.7, subd. (b).) The statute requires bad faith. Only lamentable inattention was shown here and no finding of bad faith was made.

---

[1] All statutory references are to this Code.

2

And three, making sanctions payable to the defendant is not allowed under the statute when a trial court sets an OSC for sanctions pursuant to section 128.7 on its own motion. (*Malovec v. Hamrell* (1999) 70 Cal.App.4th 434, 436-437: ["We conclude: . . . (2) a trial court may not award section 128.7 monetary sanctions to an opposing party on its own motion."]) We therefore reverse with the direction to vacate the sanction order.

But there is plenty of blame to go around here. While we reverse the trial judge's order, and acknowledge the poor performance of plaintiff's counsel, we find ourselves equally disappointed by defendant's counsel. A little civility on his part could have resolved the problems in this case early on, saved everyone a lot of time, money, and toner, and spared us the unpleasant role of judicial scold this case has forced upon us.

BACKGROUND

As might be expected of a case that enables an appellate court to antagonize both parties *and* the trial judge in the same opinion, the facts here are unusual. In late July 2011 Interstate Specialty Marketing (Interstate) filed a verified complaint for breach of contract against ICRA Sapphire (Sapphire). The basic point of the complaint was that, sometime around November 2002, Interstate had contracted for Sapphire to convert a computer software application from a "DOS" format to a format supportable by Microsoft. Five years and $1 million later, Sapphire hadn't completed the conversion.

The complaint averred that a true and correct copy of "the agreement" was attached as exhibit "A" – a letter dated either November 14 or 15, 2002, outlining Sapphire's conversion proposal.[2] Counsel for Interstate might have more felicitously

---

[2] The particular letter attached to the complaint copied into the appellant's appendix has some legibility problems. Someone appears to have taken a felt marker and highlighted various passages. Unfortunately, for our purposes, the effect is to redact those passages by making them unreadable. In particular, in the upper right hand corner of Appendix A are two dates, one legible and one that gives the appearance of redaction. The legible date is November 15, 2002, but just above it is a redacted date, which is not quite legible, save that the word "November" can be barely made out. The complaint itself states the agreement was entered into on or about

3

phrased the assertion that the attached letter was *the* agreement. As he would later explain, at the time of preparation of the complaint, Interstate "diligently" searched for a copy of the agreement, but couldn't find a "signed" version, because the true, signed version had either been lost or perhaps not provided to Interstate in the first place. Interstate and its attorney believed "to the best of their knowledge" that the copy attached was indeed a true and correct copy of the agreement, but reference to it as *the* agreement was problematic, and Interstate's counsel would later have reason to wish he had used the words "information and belief" on this point.

Defendant Sapphire, as it turned out, had a true copy of the *signed* agreement, which it attached to a cross-complaint filed in late September 2011. This particular document was dated November 26, 2002.[3]

The difference in the two documents apparently went unnoticed by Interstate's counsel. Within two weeks of Sapphire's cross-complaint, Interstate filed its verified first amended complaint, but the November 14-15 document was still attached as a true and correct copy of the agreement.

The precise moment at which counsel for Interstate was disabused of his notion the November 14-15 document was the true embodiment of *the* agreement is not clear from the record.[4] There is nothing to indicate counsel for Sapphire ever brought the mistake to Interstate's counsel's attention by anything as clear and informal as a phone call, much less a letter. What the record does show is that Interstate's counsel would have figured out the mistake by being attentive to what Sapphire was producing by way

_____

November 14, and the November 14 date is reiterated in the opening brief. For clarity's sake, we will refer to the document initially attached to Interstate's complaint as the November 14-15 document.

[3] There are no redaction effects on this document, though the signatures are not quite legible. Sapphire's vice-president signed it December 5, 2002 – that much is clear – but we cannot tell who signed it for Interstate, or when. We will refer to this, the correct document, as the November 26 document.

[4] Interstate's counsel's declaration on the point, first filed in a motion for leave to amend in June 2012, is a bit cagey on the precise date – basically exploiting the generality inherent in the word "after." Thus Interstate's counsel's declaration only admitted that at some indefinite point "[a]fter" filing the first amended complaint, Interstate learned which document was correct.

4

of pleadings and formal discovery. First, there was the September 2011 cross-complaint, which alleged that the *November 26* document was *the* agreement. Then, in early November 2011, Sapphire served a request for admissions on Interstate, in which Sapphire asked Interstate to admit that the November 14-15 document was *not* "the final expression of the parties." Interstate did so admit on or around December 21, 2011. And in mid-February 2012 Sapphire expressly asserted (in response to a request propounded by Interstate) that the November 14-15 document was not the "operative" contract between the parties.[5]

In any event, Interstate's counsel clearly was aware of the mistake after March 22, 2012. On that date, Sapphire gained his attention by bringing a motion for summary judgment based solely on the document error. The motion was set three months hence, on June 22, 2012. Sapphire's theory was that Interstate could not, as a matter of law, prevail because the November 14-15 document had been admitted by Interstate not to be the final expression of the contract between the parties – a pretty good theory.

Interstate's counsel finally brought an ex parte motion to formally amend the complaint to allege the right (November 26) document on *June 5,* 2012, which was less than three weeks before the June 22 hearing on the summary judgment motion. On June 7, the judge took the ex parte motion under submission and announced he would rule on the ex parte motion to amend at the same time he ruled on the summary judgment motion.

On the merits, his ruling was a big win for Interstate. Sapphire's summary judgment motion was denied, with the trial judge first noting the November 14-15 document was "similar" to the November 26 document, and more pointedly noting Sapphire had failed to state any material differences in the two. He also rescued

---

[5]  The nature of that request is not in the record.

Interstate from its mistake in attaching the wrong document by granting its June 5 ex parte motion for leave to amend the complaint.

But the judge also made a rather large entry in Interstate's debit column. On his own motion, he set an order to show cause "re: Dismissal re Sanctions" as against Interstate and its counsel because Interstate had "attached and incorporated into its verified complaint a purported agreement between [Interstate] and [Sapphire] that was not a true and correct copy of the alleged actual agreement between these parties." He set July 13 for the order to show cause.

That gave Interstate's counsel three weeks to explain what happened (i.e., the diligent search story we have related above). Sapphire countered by emphasizing the relatively unhurried pace at which Interstate's counsel sought to correct the mistake; it sought $5,076.16 for fees incurred in bringing the failed summary judgment motion to court.[6] The court alluded to section 128.7's 21-day safe harbor provision, but concluded the 21 days began with the filing of the motion for summary judgment in March, and noting it took Interstate's counsel more than two months thereafter to request amendment of the complaint.

The judge's point was that Interstate's counsel had "put the defense in the position of having to expend a lot of money just to fix that which was wrong to begin with." In fact, the judge found it "reprehensible" Sapphire had to spend "over $5,000 to fix a significant error in the pleading." He felt "cost allocation" alone required the sanction.[7] When Interstate's counsel made the argument that the whole thing could have

---

[6] The breakdown of hours submitted to the trial court begins with research regarding contract verification begun in January 2012 and ends with counsel's showing up for the June 22, 2012 hearing on that motion. In other words, Sapphire asked for fees for having brought a motion which was denied on the merits.

[7] "I'm not looking for a pound of flesh here. This isn't sanctions for the sake of sanctions. If I was doing that I'd be happy to help rectify the court's budget problems by sanctioning you in the extreme. That's not the point of this. [¶] To me this is just cost allocation. I don't think that [Sapphire] should have been put to the test of having to go through this effort of filing a summary judgment motion and go through all the work that they did and all the expense that they did do, just to fix a problem that I think you had the resolution in your hand even before you filed the cross-complaint. So it's again $5,076."

6

been avoided if Sapphire just "picked up the phone," the judge's comment was "I'm beyond that at this point."

The judge then elaborated on the safe-harbor aspect of section 128.7. The judge guessed – and given the record before us, we have to admit it is one of the possibilities – that Sapphire's summary judgment motion simply went into the "in-basket and didn't get picked up until a few days before the due date of the opposition and suddenly the light comes on." In addition to section 128.7, the trial judge also alluded to a "common law" authority of the court to justify the sanction order. His formal judgment awarding sanctions to Sapphire was filed August 7. Interstate's counsel wasted no time in filing his notice of appeal.

DISCUSSION

The trial judge prefaced his decision to impose sanctions on Interstate and its counsel (and under these facts, we assume the brunt would be borne by counsel) with a reference to Shakespeare –Shylock's collateral in *Merchant of Venice*. He might well have chosen a different Shakespeare play and allusion – to the plague deserved by two warring houses each of whom has caused unnecessary bloodletting. Both sides here could have done better.

First, let us note the trial judge had good reason to be chagrined by the conduct of Interstate's counsel, who clearly was not paying close attention to the filings in his case. Interstate's counsel slouched toward the correction of the wrong document attached to a verified complaint and then was slow to respond to the wake-up call represented by Sapphire's summary judgment motion. The motion was filed in March; Interstate's counsel did nothing until June. That bit of sloth *did* in fact cause the trial judge an unnecessary hearing and, when all was said and done, resulted in a waste of everybody's time. This was a very hard way to get the case back to square one.

But Sapphire's counsel was not entirely blameless, either. He was doubtless aware of the great preference in the law for decisions on the merits, as distinct

7

from decisions grounded in an opponent's careless error. "[T]he policy favoring trial . . . of an action on the merits [is] generally to be preferred over the policy that requires dismissal for failure to proceed with reasonable diligence in the prosecution of an action . . . ." (Section 583.130.) "Finally, all things being equal, we deem it preferable to apply our decisions in such a manner as to preserve, rather than foreclose, a litigant's day in court on the merits of his or her action." (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 509.)

The trial judge was thus perhaps too charitable when he opined that Sapphire had been *forced* to bring the motion for summary judgment. Sapphire's counsel could have picked up the telephone or written a letter and simply explained that Interstate had the wrong document, expressed a willingness to stipulate to an amendment, and only if Interstate had persisted in doing nothing, brought some sort of motion or other proceeding to correct the mistake. *That* would have been the civil and professionally correct thing to do. That seems to us to be what the authors of Section 583.130 had in mind thirty years ago when they wrote, "It is the policy of the state that a plaintiff shall proceed with reasonable diligence in the prosecution of an action *but that all parties shall cooperate in bringing the action to trial or other disposition.*" (Italics added.) Instead, Sapphire's counsel yielded to the temptation to exploit an adversary's gaffe so as to deny him a hearing on the merits.

We encountered pretty much the same mindset in *Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267. That case involved an attorney who tried to turn his opponent's inartful defense of a lawsuit into not just a defeat, but an undeserved debacle. We rejected the Vince Lombardi approach to the law there and we reject it here.[8]

---

[8] Green Bay Packers football coach Vince Lombardi famously opined that, "Winning isn't everything; it's the only thing." Lombardi knew football; he never claimed to know anything about the practice of law.

Counsel here was not as culpable as counsel in Kim, but he did evidence a disturbing predisposition to pick up the sword before the ploughshare. We need to turn away from that kind of practice. "The law should not create an incentive to take the scorched earth, feet-to-the-fire attitude that is all too common in litigation today." (*Pham v. Nguyen* (1997) 54 Cal.App.4th 11, 17.) "We close this discussion with a reminder to counsel – all counsel, regardless of practice, regardless of age – that zealous advocacy does not equate with "attack dog" or "scorched earth"; nor does it mean lack of civility. [Citations – *valuable citations*.] Zeal and vigor in the representation of clients are commendable. So are civility, courtesy, and cooperation. They are not mutually exclusive." (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1537.)

Plagues having been visited on both sides, we come – finally – to the basis for our reversal of the judgment. Mercifully, little must be said about that other than to explain that we cannot bring the trial judge's sanctions within the statute and case law developed under it. The text of the statute in subdivision (c)(2) plainly provides for a 21-day safe harbor that begins to run from the *service of notice* of the OSC hearing at which sanctions under section 128.7 might be imposed.[9] We can't make Sapphire's motion for summary judgment serve as the equivalent of such an OSC. Sapphire did not ask for sanctions based on section 128.7 in that motion. Nothing in the section would allow for silent running of a safe harbor statute; it's not a safe harbor if there are enemy submarines in it. Indeed, this court rejected a similar argument (the idea counsel's adequate warning

---

[9] Here is the text of subdivision (c)(2):

(c) If, *after notice and a reasonable opportunity to respond*, the court determines that subdivision (b) has been violated, the court may, *subject to the conditions stated below*, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation. In determining what sanctions, if any, should be ordered, the court shall consider whether a party seeking sanctions has exercised due diligence.

". . . .

"(2) On its own motion, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b), unless, *within 21 days of service of the order to show cause, the challenged paper, claim, defense, contention, allegation, or denial is withdrawn or appropriately corrected.*" (Italics added.)

9

was enough to excuse the safe harbor provision) in *Hart v. Avetoom* (2002) 95 Cal.App.4th 410, 414 ["'Close' is good enough in horseshoes and hand grenades, but not in the context of the sanctions statute."].)

Second, Interstate's counsel's derelictions are not the sort which merit sanctions under section 128.7. Subdivision (b) of section 128.7 lists four warranties incorporated in a complaint whose falsity will support sanctions:

"(1) It is not being presented primarily for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

"(2) The claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

"(3) The allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

"(4) The denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief." None of these categories applies here.

Here, (1) is not applicable because the attachment of the not-quite-final draft of the contract was not done for an improper purpose; client and counsel mistakenly thought (and there is no evidence their mistake was not in good faith) they had the final draft. (2) is not applicable because the substance of Interstate's suit is a legitimate, perfectly conventional "we didn't get what we paid for" breach of contract action. (3) doesn't apply, because even if there was a mistake about the particular draft of the contract, there was, as the trial judge recognized, still ample evidentiary support for the proposition there *was* a contract and Interstate had a viable cause of action for breach of it. And (4) doesn't apply because it only addresses denials, not allegations. So section 128.7 was not applicable on the merits.

10

And finally, when a trial judge sets an OSC under section 128.7 on his or her own motion, case law has held the statute does not allow for any resultant sanctions to be paid to the opposite party. (*Malovec v. Hamrell, supra,* 70 Cal.App.4th at pp. 443-444 ["A monetary sanction imposed after a court motion is limited to a penalty payable to the court and may not include or consist of monetary sanctions payable to a party."].)

The trial court's invocation of a "common law" authority for imposing the sanction here runs afoul of *Bauguess v. Paine* (1978) 22 Cal.3d 626, 637-638, which held that a court's inherent power to supervise judicial proceedings does not encompass the power to award attorney fees as sanctions for attorney misconduct, absent specific legislative authorization or agreement of the parties. As explained later in *Olmstead v. Arthur J. Gallagher & Co.* (2004) 32 Cal.4th 804, 809-810, a separate statute, section 128.5, was enacted "in response" to *Bauguess*, which gave power to the courts to impose sanctions for frivolous actions or intentional delaying tactics, but then limited section 128.5 to actions taken prior to 1995. The upshot is that the *Bauguess* rule is still in effect for errors like not getting everything in a verified complaint exactly right.

As to the risks of incorrect verification, the Rutter Civil Procedure Treatise spells them out. The chief one is "risk of impeachment, or even perjury" if the proof at trial contradicts the party's verified complaint. (See Rylaarsdam et al., Cal. Civil Procedure Before Trial (The Rutter Group 2012) [¶] 6:318, p. 6-87.) No doubt Sapphire's counsel will make whatever hay can be made from Interstate's mistake in other contexts in this litigation. But there is none to be made here.

11

DISPOSITION

The order awarding Sapphire sanctions of $5,076.16 is vacated, and the trial court is directed to enter a new order denying its own motion for sanctions. And, as the prevailing party, Interstate will recover its costs on appeal. This is not a punishment of Sapphire and its counsel; it is the default cost apportionment. But it is impossible to make the order without observing that a phone call alerting opposing counsel to his corrigendum, would have avoided this consequence.


BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.


12