Filed 1/13/16  Bailey v. Rose CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GARRY A. BAILEY et al., | H040711 (Santa Clara County Super. Ct. No. 1-10-CV-179515) |
| Plaintiffs and Respondents, | |
| v. | |
| CHARLES EVERETTE ROSE, | |
| Defendant and Appellant. | |

Defendant Charles Everette Rose appeals from a default judgment, challenging the denial of relief from default and the prove-up damages supporting the judgment.  Finding no error, we will affirm.

## I.  TRIAL COURT PROCEEDINGS

Plaintiffs brought a class action complaint against several individuals and entities including defendant Charles Everette Rose.[1]  Rose was named in the first amended complaint, which alleged violations under the Consumer Legal Remedies Act (Civ. Code, § 1750, et seq. (the Act)) and the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C § 1962 (RICO)), conspiracy to breach fiduciary duty, unlawful solicitation (Bus. & Prof. Code, § 6150, et seq.), unfair competition (Bus. & Prof. Code, § 17200, et seq.), interference with contractual relations, and fraud.  The complaint also alleged

---

[1] The other defendants were Mohamed Haffar, Haffar & Associates, Michael Nazarinia, Daylight Technologies, Inc. (Daylight), Amwest Capital Mortgage, Inc., and Glenn Hinton.  Only defendant Rose is a party to this appeal.

1

negligence, professional negligence, and breach of fiduciary duty against other defendants. The complaint alleged defendants used " 'robo-dialers' " and telemarketers to solicit clients and collect advance fees for loan modification services that were not performed or supervised by a licensed attorney. Plaintiffs alleged "[d]efendants sent the homeowners a contract, along with a form letter instructing the homeowners to pay by cashier's check, credit card, or '… deposit the funds to Haffar & Associates [Wells Fargo] Account # XXXXXX9714.' " According to the complaint, telemarketers received a $600 commission when they "convinc[ed] the homeowner to pay $3,500 in advance 'legal fees.' " Plaintiffs alleged Haffar & Associates received more than $3.8 million in advance fees from a class of "approximately 1,100 homeowners," no meaningful services were performed, and defendants refused requests to refund unearned fees. Defendant, in pro per, filed an answer to the first amended complaint denying culpability.

Class members testified by declaration in support of plaintiffs' motion for class certification that telemarketers solicited them to pay $3,500 for home loan modification services, they paid that fee, and they never received the promised services or refunds. The court certified the class and ordered plaintiffs to file a second amended complaint conforming the class definition to the certification.

In February 2012, plaintiffs filed a second amended complaint, again naming Rose and expanding the class definition to include: "All persons who retained Haffar & Associates for mortgage loan modification services and who either (1) paid a fee for those services prior to their full performance or (2) were first contacted by a telemarketer offering services on behalf of Haffar & Associates, or both, and who did not receive a full refund of all fees paid." The second amended complaint also added a request for damages under section 1782 of the Act. In support of that request, plaintiffs asserted their compliance with statutory notice and demand requirements. In March 2012, the default of codefendants Mohamed Haffar and Haffar & Associates (the Haffar defendants) was entered for failure to answer the second amended complaint, and Rose

2

was served with that notice. In April 2012, the parties filed a joint statement and stipulation proposing a form and manner of class notice. That stipulation, signed by Rose, acknowledged the Haffar defendants' default for failure to answer the second amended complaint.

On May 18, 2012, the court served the parties by e-mail with the order approving the joint class notice proposal. Four minutes later, Rose e-mailed plaintiffs' counsel asking "Anything I need to do [?]" Plaintiffs' counsel immediately responded "I think you are referring to the e-mail from the court about class notice. No, there's nothing you need to do," and in a follow-up e-mail advised Rose "There's nothing more you need to sign at this time."

Three days later, plaintiffs' counsel sent Rose an e-mail seeking participation in a joint case management statement for a June 8 case management conference. Counsel asked Rose when he planned to file an answer to the second amended complaint and respond to document production demands and interrogatories. She also asked Rose for a deposition date. Rose responded "I have no idea I was supposed to or should … if I get a judgment against me … I will file BK im 28 BTW … it's not a big deal. [¶] I have decided moving forward you are a waste of my time … leave us alone. [¶] I was your best tool, until you decided to decline my offer. I wanted to be dropped from the case and wasn't going to come sit with you and lay out everything without some assurance I would be released. [¶] Stay Evil! … Your time will come, I'm all about karma. You have been snood since day 1." That was the last e-mail exchange between plaintiffs' counsel and Rose. Later that day, plaintiffs filed a request for Rose's default, which the clerk entered and electronically served on Rose. Rose received notice but did not appear at the June 8 case management conference or a later conference held in September.

Rose retained attorney Moataz Hamza sometime after entry of default, and in February 2013 moved to set aside the May 2012 default, claiming plaintiffs' counsel had failed to serve the second amended complaint and had willfully concealed its filing. In

3

support of that claim, Rose declared under penalty of perjury that he had not been served with the second amended complaint, and, upon learning of the default in November 2012, he immediately sought counsel for assistance. The trial court denied the motion, finding Rose not diligent or credible, his testimony belied by the record.

In June 2013, Rose's current counsel moved for reconsideration, arguing that Hamza had acted negligently, and Rose was entitled to equitable relief from default because Hamza's failings amounted to positive misconduct. In a declaration supporting that motion, Rose claimed Hamza "inaccurately state[d] that [Rose] discovered that entry of default was entered against [him] in November 2012." Rose claimed he had been diligent in seeking to set aside the default by hiring Hamza in July 2012, but Hamza delayed filing the motion, claiming in October that there was plenty of time to file it. Hamza filed a declaration voicing his misunderstanding that a motion to set aside default was due within six months after entry of judgment, not six months after entry of default. Rose argued further that the default was facially void under *Carrasco v. Craft* (1985) 164 Cal.App.3d 796 (*Carrasco*) and *Gray v. Hall* (1928) 203 Cal. 306 (*Gray*). He pressed that the second amended complaint did not contain substantive changes with respect to the claims against him; therefore, he was not required to answer the second amended complaint and the resulting default was void. That motion was denied.

In April 2013, while the motion for relief from default was pending, plaintiffs moved under section 1781, subdivision (c)(3) of the Act for a finding of no defense against non-defaulting defendants Glenn Hinton, Daylight Technologies, and Amwest Capital Mortgage (the Hinton defendants). In support of that motion, plaintiffs submitted bank records and witness declarations tracing class money through Haffar & Associates' Wells Fargo account (the 9714 account) to the Hinton defendants. Telemarketers testified by declaration that they worked for Haffar & Associates under Rose's supervision and received paychecks from Daylight Technologies. Rose admitted to working at Daylight, a company that generated clients in the mortgage modification

4

business. According to telemarketer declarations, Rose provided the Haffar & Associates sales division with phone numbers generated by robo-dialers, and telemarketers solicited class members from those phone lists to pay $3,500 for loan modification services. One class member testified that Rose himself solicited her to pay $3,500 for loan modification services, and, as instructed, she deposited that fee into the 9714 account. The court granted that motion, unopposed by the Hinton defendants, but it denied a separate no defense motion as to defendant Nazarinia, with whom plaintiffs later settled.

In September 2013, plaintiffs moved for judgment on their claim under the Act and for dismissal of the remaining causes of action as to the Hinton defendants. Plaintiffs also moved for a default judgment on all causes of action against Rose and the Haffar defendants (the defaulting defendants). On the Consumer Legal Remedies Act claim, the court ordered the Hinton defendants to pay $4,513,676 in damages (the total deposited into the 9714 account between November 2008 and October 2010 ($4,546,032) less an offset for the Nazarinia settlement), with the defaulting defendants jointly and severally liable for $3.8 million (the amount alleged in the operative complaint) of that amount. The Hinton defendants were ordered to pay prejudgment interest, costs and attorney's fees.

The court ordered the defaulting defendants jointly and severally to pay $3.8 million in damages on causes of action under the Act, conspiracy to breach fiduciary duty, unlawful solicitation, unlawful competition, and RICO, trebled to $11,400,000 under RICO (18 U.S.C § 1964(c)), plus attorney's fees, costs, and prejudgment interest. On plaintiffs' individual interference with contractual relations and fraud claims, the court ordered the defaulting defendants jointly and severally to pay $50,000 in damages plus prejudgment interest.

Rose moved unsuccessfully for a new trial, repeating his arguments that the default was void and he should be relieved from default based on Hamza's positive

5

misconduct, and challenging the sufficiency of the evidence supporting the $3.8 million damages award.

## II.  DISCUSSION

### A.    ENTRY OF DEFAULT

Relief from default is governed by Code of Civil Procedure section 473.[2]  Under section 473, subdivision (b), the trial court may provide relief upon a showing of "mistake, inadvertence, surprise, or excusable neglect."  Relief must be sought within a reasonable time, but in no case more than six months after entry of default.  (§ 473, subd. (b).)  After statutory relief is no longer available, the trial court has equitable power to vacate a default.  (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 981.)  Although extrinsic fraud or mistake may form the basis for equitable relief (*In re Marriage of Park* (1980) 27 Cal.3d 337, 342), the trial court's equitable power to set aside a default is narrower, not wider, than the authority under section 473, subdivision (b).  (*Weitz v. Yankosky* (1966) 63 Cal.2d 849, 857 (*Weitz*).)

The question as to whether a default was properly entered is reviewable upon appeal from the final judgment.  (*Bristol Convalescent Hospital v. Stone* (1968) 258 Cal.App.2d 848, 859 (*Bristol*).)  We review the trial court's denial of a motion to set aside a default—both under section 473 and on equitable grounds—for an abuse of discretion.  (*Rappleyea v. Campbell*, *supra*, 8 Cal.4th at p. 981.)  We review whether the default was void as a matter of law de novo.  (*Talley v. Valuation Counselors Group, Inc.* (2010) 191 Cal.App.4th 132, 146.)

#### 1.     Leave of Court was not Required to Amend the Consumer Legal Remedies Act Cause of Action

Rose contends that the second amended complaint was not an operative pleading, and thus required no answer, because plaintiffs did not have leave of court to amend

---

[2] Unspecified statutory references are to the Code of Civil Procedure.

6

beyond the class definition. Rose cites section 472, which allows a plaintiff to amend a complaint once as a matter of right, and section 473, subdivision (a)(1), which requires leave of court for further amendment. But Civil Code section 1782, not the Code of Civil Procedure sections cited by Rose, controls the amendment to plaintiffs' claim under the Act.

Civil Code section 1782, subdivision (a) requires at least 30 days notice before a consumer may commence an action for damages under the Act, and Civil Code section 1782, subdivision (d) provides authority to amend a complaint without leave of court to include a request for damages after notice is given. Paragraph 62 in the second amended complaint sought damages under the Act and asserted that plaintiffs had complied with the requisite notice and demand requirements. That particular amendment was therefore proper under Civil Code section 1782, subdivision (d) without leave of court.

### 2. The Default Was Not Void as a Matter of Law

Alternatively, Rose contends the second amended complaint contained no substantive changes from the first amended complaint; accordingly, he argues that his answer to the first amended complaint served as the answer to the second amended complaint by operation of law, rendering the default void. Under section 473, subdivision (d), the court may set aside a void judgment or order at any time.

Rose relies on *Carrasco*, *supra*, 164 Cal.App.3d 796, to argue that the default was void based on no substantive change between the first and second amended complaints. The defendants in *Carrasco* filed a motion to set aside a default entered five months earlier, arguing that "the default and default judgment were void insofar as the amended complaint made no new substantial allegation against either defendant, and, therefore, no new answer was required." (*Id*. at pp. 801, 807.) The trial court rejected that argument as beyond the scope of the defendants' motion to set aside default, which was based "on the grounds that the default and default judgment entered against defendants in this action

7

were taken against them by reason of mistake, inadvertence, and/or excusable neglect." (*Id*. at p. 808.)  The *Carrasco* court determined the question "whether the default judgment should be voided" was properly before the trial court (*ibid*.), and in answering that legal question in the first instance, concluded that the trial court erred by entering default because the original answer could stand as an answer to the amended complaint. (*Id*. at p. 811.)

In reaching its conclusion, *Carrasco* relied on *Gray*, *supra*, 203 Cal. 306, which explained that judgment by default may be taken against a defendant who fails to answer an amended complaint, but only when the new complaint changed or added a cause of action, not "where the original plea or answer set forth a sufficient defense to the declaration or complaint as amended." (*Carrasco*, *supra*, 164 Cal.App.3d at pp. 808–809.)  *Gray* further explained:  " 'In short, when a complaint is amended after answer, the defendant is not bound to answer *de novo*.  He may do so if he chooses; but, if he does not elect to do so, his original answer stands as his answer to the amended complaint; and in such a case he will not be in default except as to the additional facts set up in the amended complaint, and not put in issue by the answer.' "  (*Gray*, at p. 313.)

More recently, the California Supreme Court distinguished between judgments that are void and those that are simply voidable in *People v. American Contractors Indemnity Co*. (2004) 33 Cal.4th 653.  A judgment is void when the court lacks jurisdiction in a fundamental sense.  Lack of fundamental jurisdiction " 'means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.' "  (*Id*. at p. 660.)  In significant contrast, a court *exceeds* its jurisdiction " '[W]hen a statute authorizes [a] prescribed procedure, and the court acts contrary to the authority thus conferred[.]' "  (*Id*. at p. 661.)  "When a court has fundamental jurisdiction, but acts in excess of its jurisdiction, its act or judgment is merely voidable." (*Ibid*.)  In light of *American Contractors*, we reject defendant's view that *Carrasco* stands for the proposition that a default is void if entered for failure to

8

answer an amended complaint. Rather, *Carrasco* can only be understood as setting aside a voidable default.

Guided by *American Contractors*, it is clear that the error complained of here—entering default for failure to answer an amended complaint even where the original answer possibly could stand as an answer to the amended complaint—would render the default merely voidable. (Accord, *Bristol Convalescent Hospital v. Stone*, *supra*, 258 Cal.App.2d at p. 862 ["It is clear from the decision of *Gray v. Hall*, *supra*, 203 Cal. 306, that a judgment entered upon default for want of an answer to an amended complaint is not a void judgment if the time for answering under ordinary circumstances had indeed expired before entry of the default. Such a default, it would seem, is of the class that may be set aside only under section 473, Code of Civil Procedure, or on appeal from the judgment, or by suit in equity."].) This is because the trial court had jurisdiction over the subject matter and the parties when it issued the default, and the default, entered after the time to answer the second amended complaint had expired, was proper. (*Id.* at p. 862 ["The entry of the default is a ministerial duty performed by the clerk, who has no duty and no authority himself to make a determination whether the answer to the original complaint might stand as an answer to the amended complaint. … The clerk's function is to determine if there is proof of service and whether an answer has been filed within the time allowed by law or the order of the court."].)

Having concluded that the default here is not void as a matter of law, we find no abuse of discretion in the trial court's denial of Rose's pleas to set aside the default. Rose's motion for relief was made nine months after default was entered. Thus, the motion was governed not by section 473, but rather by the court's more narrow equitable power. (*Weitz*, *supra*, 63 Cal.2d at p. 857.)

If Rose, before the time to answer the second amended complaint had elapsed, had formed the opinion that a new answer was not required, he should have brought the issue to the attention of the trial court preferably before the entry of default but in any event by

9

a timely motion to set aside the default once entered. (*Bristol*, *supra*, 258 Cal.App.2d at p. 863.) But rather than timely indicating that his first answer would serve as his answer to the second amended complaint, Rose appears to have intentionally defaulted. His belated motion for relief from that default did not even raise *Carrasco/Gray*. Instead, Rose displayed an utter lack of candor by making baseless fraud allegations against opposing counsel, and later deflecting culpability for those unfounded allegations onto his lawyer. The trial court did not abuse its discretion by rejecting Rose's *Carrasco*/*Gray* argument on reconsideration as a basis for equitable relief.

### 3. Attorney Hamza's Conduct Does Not Support Equitable Relief from Default

Rose argues that he is entitled to equitable relief from default because he was diligent in pursuing the motion to set aside default but, through no fault of his own, his lawyer failed to timely file the motion. An attorney's conduct may constitute grounds for the type of equitable relief sought here but only when there has been a " 'total failure on the part of counsel to represent the client' [citation] coupled with an absence of fault and due diligence on the part of the client [citation], absence of prejudice to the [opposing party] [citation], and a careful weighing of the public policies favoring a trial on the merits and protecting the innocent client versus those favoring finality of judgments, … and holding grossly incompetent attorneys responsible for their incompetence." (*Seacall Development, Ltd. v. Santa Monica Rent Control Bd.* (1999) 73 Cal.App.4th 201, 208.)

We find no abuse of discretion in the trial court's rejection of Rose's attorney misconduct argument. On this record, attorney Hamza did not totally fail to represent Rose: According to Hamza's declaration and e-mails submitted in support of Rose's motion for reconsideration, Hamza had drafted a motion to set aside default in July 2012. Nor does the record demonstrate due diligence or absence of fault: Rose was aware that the second amended complaint had been filed, yet he communicated an intent to walk

10

away from the case, and waited nearly two months to retain Hamza to file a motion for relief from default. Rose followed up with Hamza only once in August and once in October, and he did not act on Hamza's request to call the court to have the matter calendared. Rose also signed a declaration under penalty of perjury that he discovered the entry of default in November 2012, and only at that time began his search for counsel, a position he completely retracted in his motion for reconsideration.

## B.   EVIDENCE OF DAMAGES

When a default judgment is sought under section 585, subdivision (b), as here, the plaintiff has the affirmative duty to establish entitlement to damages. (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 287 (*Kim*).) The plaintiff must prove damages against a defaulting defendant by establishing a prima facie case. (*Johnson v. Stanhiser* (1999) 72 Cal.App.4th 357, 361.) The damages determination is reviewable on appeal (*Kim*, at p. 288; *Uva v. Evans* (1978) 83 Cal.App.3d 356, 364), but a reviewing court may interfere with a damages determination only where the award is so disproportionate to the evidence as to suggest it was "the result of passion, prejudice or corruption [citations] or where the award is so out of proportion to the evidence that it shocks the conscience of the appellate court." (*Uva*, at pp. 363–364.) Damages unsupported by substantial evidence satisfies that standard. (*Ostling v. Loring* (1994) 27 Cal.App.4th 1731, 1746.)

According to Rose, plaintiffs' only prove-up evidence was Haffar & Associates' statements showing deposits totaling $4,546,032 between November 2008 and October 2010. He argues such evidence is insufficient to support $3.8 million in damages alleged in the operative complaint. Rose contends that plaintiffs did not prove the actual size of the class, and presses that the 9714 account statements do not show the origin of deposits, much less link deposits to the loan modification clients solicited by Daylight. Rose points to the "thousands of deposits" in denominations other than $3,500 or $1,750 that the class members paid, and he argues that plaintiffs had no proof that

11

large deposits were aggregated payments from credit processing agencies such as American Express, or that those deposits constituted payments from class members. Nor, according to Rose, did plaintiffs discount from the $4.5 million deposited into the 9714 account fees paid by satisfied loan modification clients or revenue generated by attorneys working for Haffar & Associates apart from the firm's loan modification practice.

We conclude the damages award is supported by substantial evidence in the record. In addition to the 9714 account statements and counsel's declaration, the motion and judgment were based on the declarations of named plaintiffs and class representatives Garry and Brooke Bailey, Daylight's bank statements, and the court's file, including judicially noticed documents.

Garry and Brooke Bailey filed declarations in support of the motion for judgment testifying that they were telephonically solicited by Haffar & Associates to purchase loan modification services, they were told that the fee for those purported services was $3,500, they paid that fee by credit card, and they were damaged in excess of $250,000 because they relied on Haffar & Associates' " 'legal advice' " to stop paying their mortgage, and Haffar & Associates failed to perform or refund their money. In support of their Civil Code section 1781, subdivision (c)(3) no defense motion against the Hinton defendants, plaintiffs submitted class member declarations explaining that telemarketers instructed them to pay a $3,500 fee by depositing the money directly into the 9714 account, or pay by check or credit card, and they followed that instruction. Plaintiffs also submitted telemarketer declarations explaining that class members were instructed to pay $3,500, or an agreed upon first payment, by credit card, cashier's check, or by making a payment directly into the 9714 account.

Substantial evidence supports $3.8 million in damages even absent proof of the exact size of the class. By defaulting, Rose admitted to "collect[ing] advance 'legal fees'

12

from more than one thousand homeowners." (*Kim, supra*, 201 Cal.App.4th at p. 281.)[3] Further, the second amended complaint did not specifically quantify damages at $3,500 per class member, as Rose claims, and the record contains evidence that many class members paid more than $3,500. Class member King paid $3,995, class member Schwartz paid $4,095, and class member Lima paid $7,000. Judicially noticed State Bar Court filings supporting co-defendant Haffar's disbarment identified homeowners who paid $4,450, $8,200, $3,695, and $4,875 for unrealized loan modification services.

The second amended complaint did not limit the alleged damage to $1,750 or $3,500 increments, and the record contains evidence that class members paid for loan modification services in varying incremental amounts. Class member King paid in $1,750, $500, $450, and $400 increments, and she separately purchased a loan analysis for $495. Class member Schwartz purchased a similar report for an additional $595. Class member Lima made an initial $2,000 deposit into the 9714 account, and was given a payment schedule in $1,500 and $1,000 increments.

Plaintiffs also presented evidence that deposits from "American Express Settlement" and "FNBO Pymt Proc" were credit card payments from class members.[4] In opposition to Rose's motion for a new trial, plaintiffs presented a declaration from a merchant who accepts American Express card payments that those payments appear on his bank statement as "American Express Settlement," and they do not reflect the customer's exact payment because American Express deducts its fee before depositing the money into the merchant's account.

---

[3] Daylight's partial database (covering the period between December 2009 and June 2010) identified 634 persons who paid Haffar & Associates for loan modification services. Although plaintiffs were able to identify another 181 clients through advertisement, without Daylight's full database it was impossible to identify all class members.

[4] The court took judicial notice that FNBO stands for First National Bank of Omaha and FNBO provides credit card payment processing services.

Further evidence undermines Rose's argument that the damages award failed to offset legitimate revenue. By defaulting, Rose admitted that co-defendant Haffar reactivated his bar membership in June 2008 after being approached by Rose and co-defendant Hinton to market loan modification services under an attorney's name. The 9714 account was opened in late June 2008, and it saw almost no activity between that time and October 2008, after which deposits surged. Plaintiffs produced Daylight's bank records showing more than $2.5 million of the $4.5 million received into the 9714 account between November 2008 and October 2010 deposited into a Daylight account. Rose admitted to working at Daylight, and telemarketers testified they were paid from Daylight's account. The California State Bar database identified co-defendant Haffar as the only attorney employed by Haffar & Associates, and a summer intern testified by declaration that two other attorneys worked out of Haffar's office, but they had private offices and maintained separate practices. Former Haffar & Associates employees testified that Haffar was rarely in the main office or the telemarketing sales office. Rose also admitted by default that no meaningful services were performed on behalf of the solicited clients. Thus, substantial evidence in the record shows that Haffar & Associates generated little or no revenue in other practice areas, or otherwise provided "hundreds of individuals … significantly lower mortgage payments" as Rose contends.[5]

Finally, the $60,000 settlement with co-defendant Nazarinia does not undermine the judgment against Rose. That settlement occurred after the trial court denied plaintiffs' motion for summary adjudication of Nazarinia's liability under the Act, finding

---

[5] Even if some clients received services of value, those contracts were void as unlawful solicitations under Business and Professions Code section 6154 because they were procured through the services of "a runner or capper," i.e., "any person, firm, association or corporation acting for consideration in any manner or in any capacity as an agent for an attorney at law or law firm … in the solicitation or procurement of business for the attorney at law or law firm[.]" (Bus. & Prof. Code, § 6151.)

a triable issue regarding his knowledge and furtherance of the alleged conspiracy. That settlement reflected the cost and associated risks of going to trial to establish Nazarinia's culpability. In contrast, not only had Rose admitted his liability by defaulting, witness declarations show Rose's direct and extensive involvement in the solicitation scheme. As head of the sales department, Rose operated the automated computer dialer that generated the sales leads, supervised the telemarketers, wrote telemarketing scripts, and directly solicited class members. The record contains substantial evidence to support the trial court's finding that class members suffered at least $3.8 million in damages.[6] Given Rose's far-reaching involvement, we cannot say that the trial court's judgment shocks our conscience, or is disproportionate to the evidence.

## III. DISPOSITION

The judgment is affirmed as to defendant Rose.

---

[6] Rose does not contest the $50,000 awarded to the Baileys, plaintiffs' entitlement to treble damages under RICO, costs, or attorney's fees.

15

_____

Grover, J.

**WE CONCUR:**



_____

Rushing, P.J.



_____

Márquez, J.



*Bailey et al. v Rose*
**H040711**