Filed 12/29/20  Pletcher v. Pavlovsky CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| MITCHELL PLETCHER, | B300591 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No.BC604669) |
| v. | |
| JON PAVLOVSKY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert Broadbent, Judge.  Affirmed.

Mitchell Pletcher, in pro per., for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

# INTRODUCTION

Appellant Mitchell Pletcher sued several defendants alleging malicious prosecution for litigation involving a failed stage musical production. Pletcher alleged that the underlying litigation damaged his reputation in the entertainment industry and caused his investment company to lose money. The defendants defaulted, and Pletcher sought a default judgment of more than $15 million.

The trial court entered a judgment of $25,000 for damage to Pletcher's reputation, plus $615 in costs. The court found that most of Pletcher's claimed damages related to alleged defamation occurring before the underlying litigation was filed. The court also found that Pletcher did not have standing to claim damages on behalf of business entities that were not included as plaintiffs. On appeal, Pletcher asserts that the court erred by rejecting the bulk of Pletcher's claimed damages. We find the court's judgment to be supported by the evidence presented, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Pletcher's complaint

On December 24, 2015, Pletcher, acting in propria persona, filed a verified complaint alleging nine causes of action for malicious prosecution. Pletcher was the only plaintiff; he asserted that he "does business . . . as an investor in entertainment, and as president and CEO of an entertainment company." The named defendants were Jon Pavlovsky; Celeste Canino; Alex Herrera; and Herrera's law firm, Herrera & Associates, P.C.

Pletcher alleged that in the underlying litigation, filed in September 2013, Pavlovsky and Canino, represented by attorney Herrera and his law firm, sued Pletcher for fraud, breach of

2

contract, unfair business practices, and other causes of action. Pletcher later clarified that the underlying litigation was brought by Celeste Gallery, a "Photography and Media company," as well as its employees and owners, Pavlovsky and Canino. Defendants in the underlying litigation were Pletcher; two companies Pletcher owned, Mitchell Anthony Productions, LLC (MAP) and Concord Investment Counsel, Inc. (CIC); an employee of MAP; and Pletcher's wife and daughter, who were also employees of MAP. MAP hired Celeste Gallery "to conduct a photo-shoot and create images and artwork for a musical MAP was attempting to produce in Los Angeles ('Beautiful')."

Pletcher alleged that as he attempted to produce Beautiful, "a few bad seeds" caused the production to fail. "Disgruntled" cast members "attempted to extort money from [Pletcher] with defaming and false claims of sexual harassment, fraud, and breach of contract." Defendants "decided to follow the path of these dishonest cast members," and set up a meeting "where Herrera, Pavlovsky and Canino together conspired to fabricate a lawsuit with inflaming false allegations that would intimidate Pletcher and cause him to make a ransom payment to them." The underlying litigation was filed a few weeks later, for the purpose of "intimidation and to force a ransom payment."

In March 2014, a demurrer to the underlying complaint was sustained with leave to amend; in November 2014 a demurrer to the first amended complaint was also sustained with leave to amend. Defendants did not further amend the complaint. In February 2015, Pletcher successfully moved to dismiss the underlying action with prejudice.

Pletcher alleged that each cause of action in the underlying litigation gave rise to a cause of action for malicious prosecution.

3

He alleged that defendants asserted their claims without probable cause, and the underlying claims were terminated in his favor.  In each cause of action, Pletcher contended that his reputation had been damaged "in a sum in excess of $1 million," his "investment management business has been damaged in a sum in excess of $1.8 million," and his "entertainment business in Hollywood and Las Vegas has been damaged in the sum [in] excess of $1 million, and Pletcher has other damages according to proof at trial."  Pletcher also requested costs and attorney fees of approximately $49,000 incurred in the underlying litigation, and punitive damages.  In his prayer for relief, Pletcher requested "damages in a sum according to proof, but at least $2,800,000.00," punitive damages, attorney fees, and costs.

## B.    Default judgment prove-up

The court entered default for Canino on July 22, 2016, and for Pavlovsky, Herrera, and Herrera & Associates on August 18, 2016.  In March 2019, Pletcher submitted a request for default judgment along with prove-up documents.  (See Code Civ. Proc., § 585, subd. (b).[1])  On the form requesting a court judgment, Pletcher stated that the demand in the complaint was $12,441,306.00, with interest of $3,234,739.56 and costs of $615.00, for a total request for damages of $15,676,660.56.  According to the documents attached to Pletcher's request, including a 26-page declaration, the bases for his damages are as follows.

Pletcher stated that he was "the President, Chief Investment Officer, Chief Compliance Officer, and Senior Financial advisor for Concord Investment Counsel Inc. (CIC),"

---

[1]All further statutory references are to the Code of Civil Procedure.

4

which was a "registered investment advisor in good standing with the SEC" that Pletcher formed in 1991.  In 2011, Pletcher "began extensive work to produce live stage events for myself individually, or for entities I planned to form and own individually."  Pletcher said he "spent vast amounts of time and money in 2011-2012 . . . establishing economic relationships" to develop future productions.

Pletcher attached an email from May 21, 2012, from a choreographer, which Pletcher stated supported his claim of "how quickly word spreads in Hollywood and the entertainment industry in general."  The email, from Spencer Liff to "Mitch," stated that "the show"—the email does not state the name of the show—constituted a decent idea but was not ready for production.  Liff also said he was "concerned by what I was hearing back from the dance community.  The LA dance world is extremely small, and word travels like wildfire. . . . There was talk of payment not being handled properly and some of the dancers feeling uncomfortable with the situation."  Liff continued, "I got uncomfortable putting my name on something that had negative energy surrounding it."  He also wrote, "I do believe you can make this show happen with a little more prep."

Pletcher stated in his declaration that "[t]he workshopping and construction of Beautiful began in November of 2012."  He stated that from 2012 to 2014, he set up "several entities in California and Nevada to provide some insulation from liabilities I might incur in the entertainment industry."  Pletcher's companies included MAP, Beautiful the Musical LLC (BTM), Mitchell Anthony Theatre LLC (MAT), and Live On Stage Productions LLC.  Pletcher stated that he was the president and sole member of each of these entities.

Pletcher stated that in February 2013, he "signed a contract with the Saban Theatre in Beverly Hills" to host Beautiful. He attached a memorandum of understanding (MOU) between MAP and the Saban Theatre, which stated that the memorandum was "a precedent of terms for a long form Rental Agreement to follow." The MOU listed show run dates from May to August; it did not include a year, but the MOU was signed on February 26, 2013. Pletcher stated in his declaration, "Confident that the construction of the show would be successful I began advertising and marketing the show and I put up billboards across Los Angeles and Beverly Hills." He attached pictures of two billboards, which he stated were "utilized by MAP in the marketing of the show Beautiful."

Pletcher stated, "During rehearsals it became clear that some of the performers lacked the talent and skills needed for the part that they had been cast to fulfill. . . . Brittany O'Connor was one of the actresses whose talent was far short of what was required for the role." He asserted that O'Connor, defendants Pavlovsky and Canino, and others "were problematic." Pletcher calls this group "the disparagers."

In April 2013, the Saban Theatre canceled its contract; Pletcher stated that he did not know why at the time. Pletcher "desperately sought other options [for venues] in Los Angeles all of which eventually opted not to work with Pletcher because of misrepresentations and defamation heard from Pavlovsky and Canino and other individuals working in concert with Pavlovsky and Canino to defame Pletcher."

Pletcher stated that he then attempted to produce Beautiful in Las Vegas in May 2013. Pletcher stated that the Boulevard Theater in Las Vegas "decided to partner with me to

produce Beautiful at the Boulevard Theater and contracts were signed and a lease was executed and I deposited $20,000 with the Boulevard Theatre [*sic*]." The attached exhibit was an MOU between the Boulevard Theater and BTM for a six-month term beginning in July 2013. Pletcher stated in his declaration, "At the time of the execution of this contract I was doing business individually with a fictitious business name of beautiful the musical. I had planned to start an LLC called beautiful the musical but had not yet done this as of the date of the execution of this document." The document was signed on April 30, 2013 by a representative of the Boulevard Theater and Pletcher as the President of BTM.

Pletcher asserted that "a few weeks later without explanation" the Boulevard Theater cancelled the contract, and it "originally did not tell me that it was a result of conversations they had with the disparagers." He also stated that an audition for Beautiful held in Las Vegas in May 2013 was "sparsely attended." Pletcher said he learned the president of the Boulevard Theater and several performers had received an email from an address including "veronicaveronica1," which accused Pletcher of being "an alleged producer with a fledgling production company that has been abusing and sexually harassing actors, singers, and dancers this town [*sic*] for over a year now, under the guise of a musical production that he is constantly writing and rewriting."

Pletcher stated that he then "created a terrific opportunity to partner with" FX Luxury Las Vegas I to lease a theater. Pletcher attached to his declaration a "non-binding letter of intent" with FX Luxury Las Vegas I, LLC as the landlord, and "The Mitchell Anthony Theatre LLC" as the lessee, dated June 6,

2013. The lease term was 10 years for a space of 18,822 square feet, beginning July 1, 2013. The memorandum stated that it was "a general outline of lease provisions subject to further negotiations and inclusion in a lease executed by the parties. Neither the landlord nor the prospective Tenant shall have any obligation resulting from the proposal made hereby." Pletcher stated in his declaration, "At the time of the execution of this letter of intent I was doing business individually with a fictitious business name of Mitchell Anthony Theater. I had planned to start an LLC in the name of Mitchell Anthony theater but had not done this as of the date of this letter of intent." However, Pletcher stated that "[w]eeks later FX refused to move forward and give me the keys."

The underlying action against Pletcher was filed in September 2013. Pletcher stated that by October 2013, "I realized that the problems with securing a venue and cast so I could produce Beautiful were unexplainably irrational and extreme and I concluded that the disparagers had been highly effective in destroying my character." He also stated that "[b]y December 2013 I concluded my character and reputation as an emerging entertainment professional was severely damaged and I decided at that point to discontinue my efforts to produce Beautiful in Las Vegas or anywhere in US or the globe."

Pletcher explained his request for damages as follows. He stated that MAP was created to produce Beautiful, and was funded with $680,000 of capital contributed by Pletcher. Pletcher stated, "Neither myself nor any of the MAP investors ever realized any income or return on investment from their investments including my individual $680,000 of investment in MAP. I seek as damages the $680,000 that I seeded into MAP."

He also stated, "The salary for a producer in Hollywood or on Broadway is at the very minimum is [*sic*] six figures or $100,000 per year. I seek the present value of $100,000 per year for 10 years which is $831,661." Pletcher stated that he also sought the capital he invested in BTM, $136,000, and the capital he invested in MAT, $15,000. Pletcher attached to his declaration what he characterized as "the Financials for BTM" and "MAP's financial statements reflecting the seed capital contributed by myself."

Pletcher also stated that his investment business, CIC, suffered "extensive damage." Although CIC's finances were not directly affected, Pletcher stated, "I had to explain to my clients why these plans [regarding MAP] were terminated. I had to explain the false statements of sexual harassment made by the disparagers and how it terminated my ability to make the investment in the entertainment industry a success. I was humiliated when explaining these problems to clients and my investment firm was scarred deeply by the disparagers and the scars will be there forever and will hold back the growth and success of the firm for the foreseeable future. My loss here is in the millions of dollars." After discussing his asset management, Pletcher stated, "The annual management fees that I has [*sic*] been deprived of equate to at least $1 million per year for 11 years. The present value of these lost future cash flows, (discounted at a rate of 3.5%) is $9,001,551. This lost income would have been paid to myself as the sole-owner of CIC."

Pletcher also asserted that he lost income in 2014 because of an inability to work full time. Pletcher included what he characterized as an excerpt from the deposition of his psychologist in October 2015 in which the psychologist "discusses Pletcher's symptoms." The included deposition excerpt from a

different litigation includes a single page without a cover page or reporter certification. The page does not include Pletcher's name, but it appears that the deponent psychologist is discussing Pletcher's treatment by a psychiatrist. The witness states that in April 2014, "he"—presumably, Pletcher—"saw a psychiatrist," who prescribed various medications. The witness stated, "I'm assuming he's still taking an anti-anxiety medication, but I'm not real clear on that right now." Pletcher also included with his declaration eleven documents he described as "valuations and calculations supporting damages resulting from Pletcher's inability to work full time." He stated in his declaration, "The present value of this lost revenue is calculated to be $1,577,094.21."

In all, Pletcher listed his total damages as $12,441,306.[2] As noted above, Pletcher also requested interest of $3,234,739.56 and costs of $615.00, for a total request of $15,676,660.56.

In a June 3, 2019 written order, the court granted Pletcher's request for a default judgment, but found "a number of problems with Pletcher's request that the court enter a default judgment in his favor against Defendants in the amount of $15,676.660.56." The court noted that the damages Pletcher sought exceeded the $2,800,000 in damages requested in his complaint. (See § 580, subd. (a) ["The relief granted to the plaintiff, if there is no answer, cannot exceed that demanded in the complaint"].) The court also stated, "[T]o the extent that

---

[2]This number is $200,000 higher than the damages requested by category above. In summarizing each category of damages, Pletcher added $200,000 to his claim for lost CIC management fees. The declaration includes no explanation for the discrepancy.

10

Pletcher seeks recovery for damages sustained by his various companies, those companies are separate entities that are not parties to this action." The court continued, "Pletcher does not have standing to recover damages allegedly sustained by" MAP, MAT, BTM, or CIC.

The court further found that Pletcher's "lost past and future income caused by his inability to work full time" was "not supported by competent evidence." The court noted that the underlying lawsuit was filed in September 2013, and in his complaint Pletcher claimed damages relating to malicious prosecution of that action. But Pletcher "discusses how his production of 'Beautiful' fell apart, including a cancellation in April 2013 of Pletcher's contract with Saban Theatre." The court stated, "[T]he Underlying Lawsuit was filed in September 2013, so it is unclear how the filing of that lawsuit could have been a substantial factor in the demise of the production. The bulk of Pletcher's declaration appears to be about harm stemming from allegedly defamatory comments made about him by various individuals during the production, and not the filing of the Underlying Lawsuit." However, the court stated that because Pletcher stated that by December 2013 he concluded that his reputation was "severely damaged" and he delayed production of any shows until damage to his reputation could be "salvaged or vindicated," "the court finds that Defendants' wrongful conduct alleged in the complaint was a substantial factor in causing harm to Pletcher's reputation in the amount of $25,000. The court therefore awards that amount of actual damages to Pletcher on his complaint." The court denied Pletcher's request for prejudgment interest, and granted his request for $615 in costs.

11

The court therefore entered judgment in favor of Pletcher for $25,615.00.

## C.  Motion to vacate

Pletcher moved to vacate the judgment and requested that the court enter a new judgment for $1,000,000.00.  Pletcher noted the court's conclusion that Pletcher could not recover damages incurred by his business entities, and argued, "This is misguided and inconsistent with the facts and evidence."  Pletcher asserted that even though his business entities entered into contracts, the economic relationships and the "damages to economic relations were clearly directly incurred by Pletcher *himself*."  He also contended that the entities were all "single-member LLC's with Pletcher as their sole member," and as such, "any damages flow through directly to Pletcher."  He also suggested that he could amend the judgment to add the business entities.

Pletcher also disagreed with the court's conclusion that he failed to submit evidence that his reputation in the entertainment industry and financial industry was harmed by defendants' actions.  He asserted that he "present[ed] a wealth of evidence and argument as to the damages he and his investment management firm, CIC, suffered as a result of the actions of cross-defendants [*sic*]."  Pletcher included "his paystubs from the relevant period" as supplemental evidence, but said it was "essentially duplicative" of the evidence previously submitted.

Pletcher further asserted that "it is without question that the money spent building Beautiful the musical . . . was rendered useless as a direct result of the actions of defendants."  He argued that the cancellation of the show in April 2013 "is only one small piece to the overall picture in which Pletcher was ultimately prevented from doing anything further in entertainment."  He

12

argued that he should "at least be entitled to recover the verifiable hard dollars that he personally loaned" to support Beautiful, since he "was prevented from not only putting up his show in Los Angeles, but anywhere else." Pletcher stated that this amount was $816,294.00.

Finally, Pletcher asserted that the court erred by finding that he failed to show that defendants' wrongful conduct was a substantial factor in causing harm to his reputation. Pletcher argued that he "clearly enumerate[d] further monetary damages associated with reputational harm," specifically harm to his asset management business.

Following a hearing, the trial court denied Pletcher's motion. The court stated in a written ruling that Pletcher's suggestion that the judgment be amended to add his companies as plaintiffs was not viable under the statutes Pletcher cited. The court also found that Pletcher failed to demonstrate any legal or factual error with respect to Pletcher's standing to assert claims on behalf of his companies. The court further stated that Pletcher failed to present "any evidence of monetary damages suffered directly by Pletcher as a result of harm to his reputation above and beyond the $25,000 found by the court to represent harm to his reputation." The court therefore concluded that a different judgment was not required, and denied the motion.

Pletcher timely appealed.

## DISCUSSION

Pletcher asserts on appeal that in light of the evidence he presented in his default prove-up, the trial court's award of damages was insufficient. "[W]hen a plaintiff appeals from his or her award of damages after defendant defaulted," the "power of an appellate court to review the trier of fact's determination of

13

damages is severely circumscribed.  An appellate court may interfere with that determination only where the sum awarded is so disproportionate to the evidence as to suggest that the verdict was the result of passion, prejudice or corruption [citations] or where the award is so out of proportion to the evidence that it shocks the conscience of the appellate court." (*Johnson v. Stanhiser* (1999) 72 Cal.App.4th 357, 361.)  In general, a default judgment may not exceed the amount of damages a plaintiff has requested in the complaint.  (§ 580, subd. (a) ["The relief granted to the plaintiff, if there is no answer, cannot exceed that demanded in the complaint"].)

The context of Pletcher's causes of action is critical to the analysis of his contentions on appeal.  Pletcher, as the sole plaintiff, alleged nine causes of action for malicious prosecution. "[T]he measure of compensatory damages for the malicious prosecution of a civil action includes attorney fees and court costs for defending the prior action and compensation for emotional distress, mental suffering and impairment to reputation *proximately caused by the initiation and prosecution of the action*." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 59 (emphasis added).)  "When a plaintiff seeks a default judgment from the trial court, the plaintiff 'must affirmatively establish . . . entitlement to the specific judgment requested.'" (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 287 (*Kim*).)  Thus, Pletcher was required to establish that he was entitled to damages caused by the initiation and prosecution of the underlying action.

Pletcher asserts that his evidence regarding impairment to his reputation was sufficient to support a larger award, because he was "seriously damaged with respect to the entertainment

14

industry, where he was . . . unable to further pursue any work whatsoever as a result of [defendants'] actions."  As the trial court correctly observed, however, "The bulk of Pletcher's declaration appears to be about harm stemming from allegedly defamatory comments made about him by various individuals during the production [of Beautiful] and not the filing of the Underlying Lawsuit."  For example, Pletcher asserts that he demonstrated his losses by presenting evidence of the cancellation of his contracts with the Saban Theatre, the Boulevard Theater, and FX Luxury Las Vegas.  However, even assuming these could be considered contracts,[3] they were cancelled in April, May, and June 2013—before the underlying litigation was filed in September of that year. Pletcher also cites the email from Spencer Liff stating that news in the dance industry "travels by wildfire."  But that email, sent in May 2012, suggests issues surrounding the production long before the underlying litigation was filed.  In addition, the "veronicaveronica1" email, which Pletcher alleged contributed to the cancellation of the Las Vegas contracts, predated the underlying litigation by four months.  None of this evidence supports a finding that Pletcher's damages were caused by defendants' initiation and prosecution of the underlying

---

[3]As noted above, the MOU with the Saban Theatre stated that it was "a precedent of terms for a long form Rental Agreement to follow"; no rental agreement is included in the record on appeal.  The MOU with Boulevard Theater was between the theater and BTM—an entity Pletcher stated in his declaration did not actually exist at the time the MOU was signed. The document involving FX Luxury Las Vegas states that it is a "non-binding letter of intent."  It is not clear that any of these could be considered binding contracts.

15

litigation. To the contrary, it suggests that problems with the production of Beautiful existed long before the underlying litigation was filed.

Pletcher further contends that he presented evidence to demonstrate that he lost income from his investment company, CIC. However, in his declaration Pletcher attributed these losses to defamation by the disparagers, not prosecution of the underlying litigation: "The disparagers made statements publicly to actors and actresses in the entertainment industry, choreographers, venue operators, set builders, producers, and others that were false and defaming about myself. While these statements were not made to the clients of CIC these statements flowed back to many of the clients of CIC. . . ." Pletcher stated that he had to explain his losses relating to MAP to his clients, and "I was humiliated when explaining these problems to clients and my investment firm was scarred deeply by the disparagers and the scars will be there forever and will hold back the growth and success of the firm for the foreseeable future. My loss here is in the millions of dollars. Further it is easy to infer that a substantial amount of the accounts lost in 2013 through today came as a result of the scar that is on myself from the disparagers['] defamation and character attacks." Pletcher did not state a cause of action for defamation in his complaint, and he does not connect any lost income with defendants' prosecution of the underlying litigation.

Pletcher also asserts that his "prove-up specifically provided sworn deposition testimony" from a psychologist "wherein he discusses Pletcher's symptoms (detailed herein) as 'affecting his work' and caused by 'PTSD.'" In fact, the single page of deposition testimony is from a different litigation, lacks a

16

required cover page (Cal. Rules of Court, rule 3.1116(a)), never mentions Pletcher's name, and the witness simply recites what others had told him. The witness says nothing of Pletcher's ability to work and does not connect the underlying litigation with any symptoms. Indeed, Pletcher himself never states in his declaration that he was unable to work due to defendants' malicious prosecution of the underlying litigation; instead, he states that CIC's poor performance in 2013 and 2014 was "due to the illness of myself who was suffering from emotional distress due to the defamation."

Pletcher further asserts that the trial court erred in "finding that the bulk of the damages were not borne by Pletcher, [but] rather his entities," and Pletcher is entitled to damages relating to losses borne by MAP, BTM, MAT, and CIC. This contention rests on an erroneous factual presumption, however: The court did *not* determine that any damages were borne by Pletcher's entities. Instead, the court simply held that the entities were not parties to the action, and Pletcher did not have standing to seek damages on their behalf.

As the trial court noted, "Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute." (§ 367.) "In general, California law does not give a party personal standing to assert rights or interests belonging solely to others." (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 936.) Generally, when the damages consist of a "diminution in the value of [the] membership interest in the LLC occasioned by the loss of the company's assets," the injury is to the LLC, not the individual members. (*PacLink Communications Intern., Inc. v. Superior Court* (2001) 90 Cal.App.4th 958, 964; see also *Jones v. H. F. Ahmanson & Co.*

17

(1969) 1 Cal.3d 93, 106 [an action is "derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock [or] property without any severance or distribution among individual holders"]; *PacLink, supra*, 90 Cal.App.4th at p. 963 ["the principles of derivative lawsuits applicable to corporations likewise apply to a limited liability company"].) Pletcher asserts that his entities were "single-member LLC's with Pletcher as their sole member," so "any damages flow through directly to Pletcher." But when an LLC or corporation is damaged, "[t]he remedy lies with the corporation, not the shareholder, even if the injured shareholder is the sole shareholder." (*Vinci v. Waste Management, Inc.* (1995) 36 Cal.App.4th 1811, 1815.)

Pletcher suggests that the judgment could be amended to add the entities as plaintiffs. The trial court correctly rejected this argument. A default judgment is limited to the well-pleaded allegations of the complaint. (*Kim, supra,* 201 Cal.App.4th at p. 282.) "Substantively, '[t]he judgment by default is said to "confess" the material facts alleged by the plaintiff, i.e., the defendant's failure to answer has the same effect as an express admission of the matters well pleaded in the complaint.'" (*Steven M. Garber & Associates v. Eskandarian* (2007) 150 Cal.App.4th 813, 823.) Here, the defendants' default constitutes an admission that *Pletcher* was subjected to malicious prosecution; it cannot constitute an admission as to any non-plaintiff entities. Thus, damages to non-plaintiffs cannot be awarded because "[a] default judgment that awards relief beyond the type and amount sought in the operative pleadings is void." (*Sass v. Cohen* (2019) 32 Cal.App.5th 1032, 1041; see also § 585, subd. (b).) Moreover, some of Pletcher's entities would not be entitled to recover

18

damages for malicious prosecution even if they had been included in the complaint: Neither BTM nor MAT was a party to the underlying litigation. Thus, the trial court did not abuse its discretion in rejecting Pletcher's contention that he was entitled to recover damages for losses to the business entities.

Pletcher further asserts the trial court erred in finding that he failed to present evidence that he incurred $49,000 in attorney fees in defending the underlying litigation. In his default prove-up documents, Pletcher neither requested such damages nor presented evidence to support them. Pletcher argues on appeal that the court should have awarded such damages nevertheless, because Pletcher alleged them in his verified complaint. However, a court may not award damages based on nothing more than a plaintiff's declaration. In the context of a default judgment, "it is incumbent upon the plaintiff to *prove up* his damages, with actual evidence. It is wholly insufficient to simply declare" that the plaintiff is entitled to certain damages. (*Kim, supra,* 201 Cal.App.4th at p. 272 (emphasis in original).) Pletcher did not submit evidence to support a finding of attorney fees incurred in defending the underlying litigation.

In short, the trial court's findings are consistent with the evidence, and Pletcher has not demonstrated on appeal that the trial court erred.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

WILLHITE, ACTING P.J.

CURREY, J.